EL PUEBLO DE PUERTO RICO, apelado, *v.* JUAN A. RUIZ RAMOS, FÉLIX SEDA TROCHE, HIRAM FORESTIER ESTERICH, RONALD B. BLASINI RIVERA, EDGAR RAMÍREZ VILLARILL, NELSON GONZÁLEZ CRESPO, ARNALDO VARELA ROSARIO, OSVALDO H. VILOMAR INFANTE y JOAQUÍN RAMOS GIRAU, acusados y apelantes.

*Número:* CR-86-6 *Resuelto:* 31 de enero de 1990

*Harry N. Padilla Martínez*, abogado de los apelantes; *Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General*, y *Josefa A. Román García, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Nueve (9) cadetes de la fraternidad militar Las Panteras, integrada exclusivamente por miembros del Reserve Officers Training Corps (R.O.T.C.), apelan el veredicto de culpabilidad rendido por jurado por homicidio involuntario debido a la muerte de un aspirante durante una iniciación que dirigieron los acusados.

La apelación nos permite examinar algunas de las controversias jurídicas que han surgido de esta tragedia que conmovió la población estudiantil del Recinto Universitario de Mayagüez en el año 1983. Examinados los testimonios y la prueba presentada durante el juicio, confirmamos la sentencia.

I

El 26 de diciembre de 1983 Arnaldo Mercado Pérez, David Cordero y Otilio Santiago, estudiantes universitarios del Recinto Universitario de Mayagüez (R.U.M.), se reunieron en casa de este último, a las 11:45 A.M., porque a eso de la

1:00 P.M. debían partir hacia el R.U.M. para encontrarse con los acusados quienes fungían de cadetes de Las Panteras (*Panthers Military Society*), fraternidad universitaria integrada por miembors del R.O.T.C. Ese día comenzaba la última parte de la iniciación de los tres (3) finalistas que habían aprobado las pruebas de resistencia física y ejercicios militares en dos (2) campamentos anteriores:(1) Arnaldo Mercado, Otilio Santiago y David Cordero.

Aunque no había una autorización escrita de las autoridades universitarias ni había un oficial del R.O.T.C. a cargo de la supervisión general, el último campamento se celebraría desde el 26 hasta el 30 de diciembre de 1983 en Guajataca. E.N.P., pág. 78. Tampoco se les había informado a los tres (3) aspirantes los detalles de la iniciación ni le habían requerido certificados médicos para acreditar sus condiciones físicas antes de las pruebas.

---

(1) Al inicio de cada semestre académico, Las Panteras ofrecían una orientación general sobre los requisitos y propósitos del grupo universitario. Luego de asistir a esta orientación, Arnaldo Mercado decidió ingresar a Las Panteras. Igual determinación hizo Otilio Santiago, amigo de Mercado desde la infancia, David Cordero y alrededor de veintitrés (23) estudiantes más del Recinto Universitario de Mayagüez (R.U.M.). Para convertirse en miembro de Las Panteras era necesario aprobar tres (3) campamentos ofrecidos a lo largo del semestre y asistir diariamente a las sesiones de ejercicios físicos. Inicialmente los aspirantes tenían que pasar una prueba de resistencia física. Al aprobar ésta se le entregaba una boina roja que los identificaba como posibles Panteras, "Panthers Trainee". *No se les requería un certificado médico antes de comenzar la prueba de resistencia física ni antes de asistir a los campamentos.* Luego de aprobada la primera prueba, asistían diariamente al lugar destinado en el R.U.M. donde hacían ejercicios por una hora. De los 25 estudiantes que inicialmente aspiraban pertenecer al grupo, solamente quince (15) aprobaron la prueba de resistencia física. De esos quince (15), solamente diez (10) lograron aprobar los exámenes sobre ejercicios físicos y acudieron al primer campamento.

El primer campamento se celebró en Quebradillas. En éste no se podía ingerir comida ni bebida alguna. Se les enseñó a los aspirantes a subir y a bajar montes. El segundo campamento trataba sobre la sobrevivencia. Aquí se les enseñó a ingerir lagartijos, sangre de animales y un sinnúmero de frutas y vegetación silvestre. Los tres (3) aspirantes aprobaron satisfactoriamente éste y continuaron su preparación para el campamento final.

Los tres (3) aspirantes llegaron puntualmente al estacionamiento donde los acusados los habían citado. Estaban vestidos con fatiga militar y camiseta. Arnaldo Mercado era el único que tenía una camiseta blanca. Allí se encontraban también los acusados siguientes: Joaquín Ramos Girau, quien ocupaba el cargo de *Commander* de la organización Las Panteras, Félix Seda Troche, Hirám Forestier Esterich, Osvaldo H. Vilomar Infante, Juan A. Ruiz Ramos y Ronald B. Blasini Rivera, aquí apelantes. El supervisor de Las Panteras, el capitán Rosado, no estaba presente ni asistió a la actividad. Sin embargo, la norma dentro del Air Force R.O.T.C. era que el supervisor de grupo asistiera a todas las actividades oficiales de este cuerpo. E.N.P., pág. 79.

Al comenzar el campamento, los acusados ordenaron a los aspirantes que desplegaran el equipo requerido para la iniciación; un *pistol belt*, una mochila donde cargarían el equipo, una cantimplora, una pala, una soga, unos guantes, un par adicional de botas, un puñal, una brújula, un jabón, una pasta dental, un cepillo de dientes, un equipo para afeitarse, un equipo para brillar las botas, un poncho, ropa interior, un espejo, fósforos, unas linternas, unas medias, camisetas, ropa de fatiga y un *sleeping bag*. Todo el equipo pesaba alrededor de treinta y cinco (35) libras. Se les prohibió que llevaran comida en la mochila.

Luego de la inspección del equipo, Seda llamó a los aspirantes y los llevó detrás de un edificio donde, como parte del ritual, los recortó. El recorte de Mercado fue distinto al de los demás, bien pegado con una línea por el medio, "como si le hubieran afeitado esa parte". E.N.P., pág. 4. Luego del recorte, los acusados le dieron algunas clases de técnicas militares a los aspirantes e hicieron ejercicios. También prepararon unas mochilas pequeñas donde cargarían las cantimploras y las libretas requeridas. Además, llevaban réplicas de rifles M-16 (*dummies*).

Los aspirantes estuvieron desde la 1:00 P.M. hasta las 9:00 P.M. en el estacionamiento del R.O.T.C. haciendo ejercicios. Durante ese período de tiempo no les proveyeron comida ni les suministraron bebida. A esa hora de la noche se dirigieron hacia Moca en una guagua *Dodge "Pick Up"* propiedad de Joaquín Ramos Girau. Llegaron hasta el colmado *Mr. Special* en Moca y allí comenzó la primera parte del campamento: una caminata de veinte (20) millas hasta Guajataca.

Al llegar al lugar, Ramos Girau les ordenó que descansaran por diez (10) minutos. Pasado el tiempo se inició la caminata. Durante la caminata los aspirantes cargaron en sus mochilas todo el equipo requerido para el campamento. Los aspirantes estaban acompañados por Forestier, Ramos Girau, Seda y Ruiz. Ramos Girau iba en una guagua y Seda en un *Nissan Sentra* escoltando a los aspirantes.

Al comenzar la caminata, Blasini le dio la orden a los aspirantes de que comenzaran a correr. A través de toda la jornada se repitió el mismo patrón. Caminaban un tramo y corrían otro. Pero la mayor parte del tiempo corrían. Luego de recorrer un tramo considerable de la caminata, Mercado se cayó. E.N.P., pág. 31. Estaba cansado y no quería continuar. Su amigo y compañero aspirante Otilio Santiago lo animó para que continuara. Sin embargo, no pudo ayudarlo a levantarse porque uno de los acusados, Ruiz, no se lo permitió. Más adelante Cordero se cayó y Santiago y Mercado lo ayudaron a levantarse.

Continuó su curso la caminata y, mucho antes de llegar al pueblo de San Sebastián, Mercado se volvió a caer. Lucía cansado y abatido. En esta ocasión Cordero y Santiago lo ayudaron y le dieron agua. No se les permitió descansar ni tampoco fueron auxiliados por los acusados que los escoltaban en vehículos.

Después de caminar casi toda la noche, el grupo llegó al pueblo de San Sebastián en horas de la madrugada del 27 de

diciembre. Se les ordenó descansar media hora para luego continuar, pero no se les permitió ingerir bebidas ni comer.

Una vecina del lugar, la testigo Ramona Ramos, declaró que en la madrugada de 27 de diciembre, al regresar con su esposo y unos amigos de una parranda, vio un grupo de hombres con rifles que traían a una persona vestida de militar con una boina roja "como amarrado que cayó al piso". E.N.P., pág. 48. A ella le dio tanto miedo que no permitió que su esposo detuviera el carro y averiguara qué ocurría.

Claudio González Pérez, amigo y vecino de la señora Ramos, corroboró la declaración de ésta y añadió que el muchacho que cayó al piso "estaba como mongo, no se podía levantar y los demás lo levantaban por la camisa". Declaró que "notó que uno le daba con el pie y los otros parados mirando y otros lo levantaban como una soga". Pensó que se trataba de "una pandilla agrediendo a alguien". Añadió que lo más que le llamó la atención fue "las condiciones del muchacho que estaba en el piso y el trato que le estaban dando". E.N.P., págs. 50–51.

José Ángel López, otro de los vecinos que andaba en la parranda, testificó esencialmente lo mismo que los demás y añadió que el muchacho que se tambaleaba se podía diferenciar porque "llevaba una t-shirt blanca". E.N.P., pág. 53. Este testigo, luego de observar la escena, decidió regresar al lugar donde los había visto e investigar qué ocurría. Ruperto Borrero y Rosendo Mejías, vecinos que andaban en la parranda, decidieron acompañarlo. Cuando se acercaron al grupo de cadetes, uno de éstos les ordenó "vamos, circulen, circulen, que aquí no ha pasado nada, este tipo está cansado". E.N.P., pág. 55.

Al iniciarse nuevamente la caminata, los aspirantes se ayudaron entre sí a ponerse el equipo. Mercado lucía extenuado y, luego de transcurrido mil (1,000) metros, volvió a caerse en la orilla de la carretera.

Llegaron a una tiendita localizada entre una planta de la Autoridad de Energía Eléctrica y Guajataca. Estaba cerrada. Mercado estaba tan cansado que no pudo quitarse el equipo solo y fue ayudado por sus compañeros. Se acostaron a dormir en ese lugar. Era el martes 27 de diciembre en la madrugada y no habían ingerido ningún tipo de alimento desde el 26 de diciembre al mediodía.

Poco tiempo después, Ramos Girau despertó a los aspirantes para continuar la caminata. Mercado lucía particularmente mal. Tampoco pudo engancharse el equipo, por lo que fue ayudado por los demás aspirantes. Al oir las órdenes de Ramos Girau y Seda, los tres (3) aspirantes comenzaron a correr. Luego de haber corrido una "distancia relativamente corta" (E.N.P., pág. 9), Mercado se cayó por cuarta vez. Se levantó y continuaron la caminata hasta llegar a la entrada del área del campamento. Allí, Mercado cayó por quinta vez y se levantó por sí mismo agarrándose de las ramas de árboles que encontró a su alrededor.

Félix Seda, otro de los cadetes acusados, los esperaba en el campamento. Al llegar se les ordenó acostarse a dormir sin haber comido nada. Era la mañana de 27 de diciembre cuando se acostaron y fueron despertados por Seda alrededor de las 9:00 A.M. Éste les ordenó hacer *push-ups* porque Mercado, quien tenía el turno de vigilancia, se había quedado dormido. Al terminar la ronda de *push-ups*, Seda les ordenó que prepararan un albergue para dormir durante la noche.

Luego de veinticuatro (24) horas de ejercicios físicos fuertes, recibieron su primera porción de comida: una lata de *spaguetti*, un jugo de tomate grande para los tres (3), una barrita de *Milky Way* y agua para cada uno. Cordero y Santiago comieron todos los alimentos. Mercado, sin embargo, vomitó luego de tomar el jugo de tomate y no pudo continuar comiendo. Sin embargo, no fue atendido por los acusados que estaban presentes. Tampoco ofrecieron llevarlo a recibir atención médica.

Finalizado el almuerzo, los aspirantes se dirigieron hacia el área del campamento. Allí les instruyeron sobre el funcionamiento de una brújula, la formación de perímetro y los *patrols*. Seda y Ramos Girau fueron los instructores. Las clases terminaron en la noche y luego de éstas se dirigieron al refugio donde siempre tenía que estar uno de los aspirantes haciendo guardia. La primera le tocó a Mercado, luego a Santiago y por último a Cordero.

El 28 de diciembre, bien temprano en la mañana, Ramos Girau los despertó y les dio instrucciones para que hicieran una serie de ejercicios por una hora. Mercado apenas podía hacer los ejercicios. E.N.P., pág. 10. Al mediodía le dieron una porción de comida idéntica a la del día anterior. Al concluir el almuerzo, reposaron por media hora y comenzaron las clases de combate de cuerpo a cuerpo ofrecidas por Vilomar. Santiago fue el voluntario. Luego de ofrecida la demostración, los aspirantes practicaron entre sí.

En horas de la tarde se dirigieron al área donde realizarían el cruce de río (*river crossing*). El ejercicio consistía en cruzar el río por encima de una soga que iba de un extremo a otro. La distancia entre uno y otro extremo era aproximadamente de cuarenta (40) pies. En el camino hacia el lugar, los aspirantes tenían que cargar el equipo en sus espaldas. En ese momento Mercado estaba tan cansado y se estaba cayendo con tanta frecuencia que Santiago lo cargó en sus espaldas por instrucciones de Seda. Al llegar al área señalada, Mercado pidió permiso para descansar. Se le permitió y éste se quitó las botas y se acostó cerca de unos árboles.

Durante el ejercicio, Blasini estaba en el área donde se debía comenzar, mientras Seda y Vilomar se encontraban en un tubo de goma en el agua por si alguno de los aspirantes caía. Cordero y Santiago tardaron alrededor de cuarenta y cinco (45) minutos en completar el ejercicio. Cuando llegó el turno de Mercado, éste estaba tan débil que tuvo que ser ayudado por sus demás compañeros para que pudiera llegar

al lugar donde debía comenzar. Se le puso un cinturón con unas sogas como medida de seguridad. Mercado apenas se movía, constantemente se caía y en ocasiones se viraba la soga. Santiago y Cordero halaban la soga para ayudarlo a cruzar. Eran las seis (6) de la tarde cuando terminó, luego de haber transcurrido dos (2) horas quince (15) minutos desde que inició el ejercicio. Al llegar al otro extremo donde finalizaba el cruce del río, no se pudo bajar y quedó colgado. En ese lugar había una roca grande; Mercado resbaló, cayó contra la roca y se hirió en la cabeza. Nadie le revisó el golpe ni fue llevado al hospital o a un médico.

Andrés Ramos Quiles y Ángel Luis Quiles Vélez, residentes del área del campamento, declararon que observaron cuando Arnaldo Mercado cruzaba el río. Testificaron que escucharon cómo los miembros del *staff* le gritaban para que se diera prisa y cómo bajaban la soga hasta que éste introducía la cabeza en el agua para que "cogiera el impulso". Además, testificaron que cuando terminó el ejercicio y Mercado se cayó le dijeron "que parecía una nena" y "entonces el alto lo levantó y lo jamaquió por el brazo derecho y le dió con la mano por la espalda, le dio duro porque se escuchó un ruido fuerte". Le dijo, además, "que tenía que subir gateando hasta la guagua" y "que era una nena". E.N.P., pág. 64. Tanta indignación causó la escena descrita en los testigos que éstos, antes de irse, le gritaron "abusadores" a los acusados que estaban presentes. Uno de ellos contestó "echen pa'ca pa'que prueben". E.N.P., pág. 68. Agregaron los testigos que los cadetes acusados golpearon a Mercado mientras éste intentaba hacer los ejercicios ordenados. El testimonio de ambos testigos fue corroborado por Orlando Hernández Ramos y por Ramón Nieves Lebrón, quienes se encontraban cerca del lugar de los hechos y quienes también observaron toda la escena narrada por Andrés Ramos y Luis Quiles. Testificaron que oyeron cuando los acusados le proferían a Mercado palabras obscenas. E.N.P., pág. 64.

Luego el grupo regresó al campamento. Como el lugar se encontraba a milla y media del campamento y Mercado no podía caminar, Cordero y Santiago lo cargaron todo el trayecto. Al llegar al campamento, nuevamente montaron guardia. En esta ocasión, Santiago inició la guardia y le siguió Mercado.

Ya en la noche de 28 de diciembre llamaron a los aspirantes a hacer una emboscada. Al dirigirse a la misión encomendada, Mercado cayó por una cuesta, rodó y nuevamente se golpeó la cabeza. Seda, Cordero y Santiago lo levantaron del piso. Al percatarse de la herida, Seda le aplicó una crema, pero no lo llevaron al hospital ni a un médico para que atendiera su herida. Debido a su condición, Mercado fue excusado de los ejercicios de esa noche. Al finalizar se fueron a dormir, iniciando nuevamente el turno de vigilancia sin haber ingerido ningún tipo de alimento.

En la mañana de 29 de diciembre se les ordenó que cargaran unos troncos para preparar una fogata esa noche. Estos eran de tres (3) a seis (6) pies de largo y su peso variaba desde las treinta (30) hasta las sesenta y cinco (65) libras. La distancia a recorrer con los troncos al hombro era de quince (15) pies. Los aspirantes estuvieron cargando troncos durante toda la mañana. Al mediodía les dieron la misma ración de alimentos de los días anteriores. Mercado apenas pudo cargar los troncos. Intentó hacerlo, pero no tenía fuerzas y terminó arrastrando los más pequeños. Los aspirantes terminaron de cargar los troncos a las seis (6) de la tarde. Luego de esto, participaron en otra misión y Ramos Girau les contó una historia sobre una pantera y una civilización. Mientras Ramos Girau contaba la historia, Mercado tenía que apoyarse sobre los hombros de Cordero y Santiago porque no podía mantenerse en pie.

Terminada la historia, pasaron a la última fase de la iniciación: la fogata y la quema de boinas. Los acusados encendieron la fogata que habían preparado los aspirantes y que

tenía una altura de quince (15) pies y un ancho de ocho (8) pies. El propósito de ésta era quemar la boina roja que usaban los aspirantes durante su entrenamiento, ya que al convertirse en Panteras se les entregaría una boina azul.

Santiago fue el primero en someterse al ritual de la quema de boinas. Éste testificó que el sofocón de la fogata se sentía de ocho (8) a diez (10) pies de distancia. Luego le tocó el turno a Mercado. Según testificó Cordero, éste parecía que no sentía el calor del fuego a tal punto "que tuvo que halarlo para que no se cayera de frente en la fogata". E.N.P., pág. 39. Al acercarse a poner su boina en la fogata se la trajo encendida en sus manos y sufrió quemaduras de segundo grado. E.N.P., pág. 109. Ningún miembro del *staff* le revisó la mano. Tampoco le llevaron en ese momento a recibir atención médica.

Terminada esa actividad, las nuevas Panteras saludaron a los acusados e hicieron una serie de *push-ups*. Mercado se quejó del dolor de la quemadura de la mano, pero no fue atendido por los acusados. Luego tuvieron una celebración con *sandwiches* y golosinas. Ya era la madrugada de 30 de diciembre. Se acostaron a dormir hasta temprano en la mañana, cuando Mercado no pudo ayudarles a recoger la basura por lo mal que estaba. Santiago observó cuando éste nuevamente vomitó un líquido verde y le avisó a Ruiz. Todo lo que hicieron por él fue prepararle jugo de china.

Al concluir el campamento, Mercado tuvo que ser cargado en una camilla hasta el carro de Forestier. Durante el camino de regreso comentó que tenía ganas de orinar pero no podía. En el camino Mercado pidió agua y la consiguieron en un negocio. Luego fue llevado a casa de Santiago porque en su casa no había nadie. Al llegar a casa de éste tuvo que ser cargado hasta una de las habitaciones de la casa porque no podía sostenerse. Inmediatamente el grupo abandonó la residencia dejando a Mercado con Santiago. Ni aún en ese

momento solicitaron ayuda médica para atender a su compañero.

De la exposición narrativa de la prueba no surge cómo llegó la mamá de Mercado a casa de Santiago. No obstante, ésta al ver a su hijo en las condiciones que se encontraba decidió llamar a su esposo y pedirle que fuera a casa de Santiago. Tan pronto el padre de Mercado vio a su hijo decidió llevarlo a la Clínica Dr. Perea en Mayagüez.

Allí lo atendió en sala de emergencia el Dr. Orlando A. Campos, quien declaró que Mercado "se encontraba un poco abandonado, desorientado con una apariencia de estar maltrecho; que estaba en mala condición de salud y daba la impresión de encontrarse deshidratado y habiendo recibido lesiones físicas; que procedió a examinarlo físicamente y le encontró raspaduras en el cuerpo, y una en la frente media de la cabeza, otra en el lateral derecho; también le notó ciertas lesiones, raspaduras con secreciones con sanguaza sucia; que tenía los ojos hundidos, fosa oral seca, escasa y pegajosa; que tenía una deshidratación severa" y "que tenía una mano hinchada en la que tenía una raspadura con sanguaza y pús". En la piel de los brazos tenía "múltiples raspaduras"; tenía "un hematoma en el área tibial izquierda y la piel de los dedos presentaba hongos". E.N.P., págs. 88–90.

El doctor Campos, al evaluar el estado en que se encontraba Arnaldo Mercado, decidió consultar al Dr. Rafael Justiniano, cirujano general. El examen practicado por éste reveló que Mercado tenía un neumotórax y enfisema subcutáneo.(2)

Luego de que varios médicos y especialistas lo vieran y se le sometiera a diferentes tratamientos, el doctor Weber, ne-

---

(2) Un neumotórax es una enfermedad producida por la entrada del aire exterior o del aire pulmonar en la cavidad de la pleura.

El enfisema es un "[t]rastorno pulmonar caracterizado por hiperdistensión y destrucción de los espacios aéreos pulmonares". *Diccionario de términos científicos y técnicos*, Barcelona, Ed. McGraw-Hill, 1981, Vol. 2, pág. 742.

frólogo, recomendó su traslado al Hospital de la Concepción para tratarlo de paro renal. Desgraciadamente, todos los esfuerzos fueron en vano y Arnaldo Mercado murió el 5 de enero de 1984 a consecuencia de una broncopulmonía bilateral aguda y fallo renal, posiblemente secundario a ejercicios exhaustivos que le causaron una rabdomiólisis (destrucción del músculo esqueletal). E.N.P., pág. 110.

Por estos hechos el Ministerio Público presentó acusaciones por homicidio involuntario contra los aquí apelantes. Éstas leían de la manera siguiente:

Los referidos acusados JUAN ALBERTO RAMOS RUIZ, FELIX SEDA TROCHE, HIRAM FORESTIER ESTERRICH, RONALD G. BLASINI RIVERA, EDGAR RAMIREZ VILLARIL, NELSON GONZALEZ CARRERO, ARNALDO VARELA ROSARIO, OSVALDO H. VILOMAR INFANTE, JOAQUIN RAMOS GIRAU, AHMED CARRION RIVERA y con otras personas, allá en y durante los días del 26 al 30 de diciembre de 1983 en MAYAGUEZ y SAN SEBASTIAN, Puerto Rico, siendo parte de los actos cometidos en la jurisdicción del Tribunal Superior de Puerto Rico, Sala de Mayagüez, actuando en concierto y común acuerdo, actuando ilegal y negligentemente crearon una situación de peligro a la vida e integridad física del ser humano ARNALDO MERCADO PEREZ, ya que previo acuerdo, actuando ilegalmente le agredieron, produciéndole múltiples abrasiones y hematomas, y actuando negligentemente no le proveyeron alimentos suficientes, no le permitieron descanso adecuado, le crearon y le sometieron a pruebas físicas exageradas, abusivas, contínuas y extenuantes que le produjeron quemaduras en segundo grado, un estado de deshidratación extremo, un paro renal crónico, estando su condición física y fisiológica en un proceso de deterioro acelerado, fácilmente detectable y presenciado por los referidos acusados, sin que estos le brindaran la debida atención, actos que fueron la causa directa de su muerte.

Este hecho es contrario a la ley para tal caso prevista y a la paz y dignidad de "El Pueblo de Puerto Rico".

Terminado el juicio, el Jurado rindió veredicto de culpabilidad por homicidio involuntario. Se les impuso sentencia de un (1) año y tres (3) meses de reclusión a todos, excepto a Joaquín Ramos Girau, el comandante del grupo, que fue sentenciado a dos (2) años. En vista de que no tenían antecedentes penales y considerando el historial social de cada uno, el tribunal les concedió los beneficios de una sentencia suspendida.

Inconformes con este dictamen, apelan ante nos alegando, en síntesis, la comisión de cinco (5) errores:

1. Cometió error el tribunal al interpretar que los Arts. 14, 16 y 86 del Código Penal, 33 L.P.R.A. secs. 3061, 3063 y 4005, permiten el que se acuse a varias personas de dar muerte a un ser humano mediante negligencia y que se establezca un nexo a base de las figuras de mutuo y común acuerdo.

2. No se instruyó al Jurado sobre las defensas de error de hecho y consentimiento.

3. No procedía la admisión de fotografías del lugar de los hechos y del cadáver de la víctima.

4. No se estableció la culpabilidad más allá de duda razonable.

5. No se declaró con lugar una moción de absolución perentoria luego de establecerse que la evidencia presentada por el Fiscal no era constitutiva del delito de homicidio involuntario.[3]

---

[3] Los apelantes señalaron como fundamentos para que se acogiera la moción de absolución perentoria presentada en el tribunal de instancia lo siguiente: "(a) la actividad desplegada por ellos (los apelantes), el occiso y los otros dos estudiantes . . . era una voluntaria, legal y de acondicionamiento físico, por lo que ellos no podían ser responsables por el lamentable fallecimiento del segundo; (b) que en los delitos de negligencia no existe el elemento de mutuo y común acuerdo . . ., y (c) que la evidencia que presentó el ministerio público era insuficiente para sostener una convicción por el delito imputado." Alegato del apelante, pág. 15. Debido a que estos señalamientos están contenidos dentro de los demás errores, no los discutiremos por separado.

Luego de haber examinado cuidadosamente los autos originales del caso, la exposición narrativa de la prueba y los alegatos de las partes, procede la confirmación de la sentencia.

## II

■ Para poder determinar si existe responsabilidad penal de una persona por un acto delictivo hay que acudir al Art. 14 del Código Penal, 33 L.P.R.A. sec. 3061, que establece como formas de culpabilidad la intención o negligencia criminal.[4] La presencia de intención o negligencia criminal completa la configuración de los elementos constitutivos del delito. La ausencia de éstas convierte la muerte en un accidente desgraciado.

■ En el *common law*, la responsabilidad criminal de una persona se configura cuando concurren el *actus reus* (la realización de la actividad delictiva) y el *mens rea* (el elemento mental, que se puede manifestar como intención, conocimiento, imprudencia o negligencia). "Es difícil generalizar sobre el elemento mental de un delito; ya que varía de delito a delito, y puede incluso variar en un mismo delito de un elemento físico a otro . . . . Los tipos principales de culpabilidad mental son (1) intención, (2) conocimiento, (3) imprudencia, y (4) negligencia." W.R. LaFave y A.W. Scott, *Handbook on Criminal Law*, citado en D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, pág. 154.

Tradicionalmente, el conocimiento ha formado parte de la definición de "intención". Aquel que conoce las consecuen-

---

[4] Dicho artículo establece:

"Nadie podrá ser sancionado por una acción u omisión que la ley provee como delito si la misma no se realiza con intención o negligencia criminal.

"La intención o la negligencia se manifiestan por las circunstancias relacionadas con el delito, la capacidad mental y las manifestaciones y conducta de la persona.—Código Penal, 1974, art. 14." 33 L.P.R.A. sec. 3061.

cias de sus actos y las desea, o que pudo preverlas aun cuando no las desea, tiene la intención criminal requerida. El hecho de que no exista una distinción clara y tajante entre intención y conocimiento no tiene consecuencias prácticas mayores, porque "usualmente hay una buena razón para imponer responsabilidad si el acusado deseaba el resultado o solamente lo había previsto". W.R. LaFave y A.W. Scott, *Handbook on Criminal Law*, Minnesota, West Publishing Co., 1972, pág. 197.

En el *common law*, la negligencia requerida para responsabilizar penalmente a una persona es mayor que aquella que se requiere en una acción en daños y perjuicios. Usualmente se exige un mayor riesgo de causar daño o que se conozca o se pudiese prever el riesgo causado. *La negligencia se ha definido como una desviación crasa del estándar de cuidado que un hombre prudente y razonable ejercería si se encontrara en la situación del acusado.* R.M. Perkins y R.N. Boyce, *Criminal Law*, 3ra ed., Nueva York, The Foundation Press, 1982, pág. 848.

La imprudencia se reserva para aquellos casos donde, además de existir un mayor riesgo de causar daño, el actor tenía la obligación de haberlo previsto. En estos casos utilizamos un estándar subjetivo, el actor conocía el resultado de su acción o "sabía que no conocía si la acción era o no riesgosa y de hecho lo era". LaFave y Scott, *op. cit.*, pág. 213. Sin embargo, la imprudencia y la negligencia tienen algo en común. "Cada una requiere un tipo de conducta que representa una desviación crasa del estándar de cuidado de un hombre prudente y razonable." Perkins y Boyce, *op. cit.*, pág. 850.

Por otro lado, en la tradición civilista las formas de culpabilidad se dividen en el dolo y la culpa. El dolo, la forma

de culpabilidad más grave, a su vez se clasifica en dolo eventual y en dolo directo.

██ El dolo es eventual "cuando el agente se representa como un posible resultado dañoso y no obstante tal representación no renuncia a la ejecución del hecho, aceptando sus consecuencias". E. Cuello Calón, *Derecho Penal*, 18va ed., Barcelona, Ed. Bosch, 1980, T. 1, Vol. 1, pág. 444. En el dolo directo "existe la representación que eleva a un deseo expreso de efectuar el acto, queriendo la producción de los resultados. En este caso se configura una voluntad totalmente comprometida con los actos delictivos realizados". Nevares-Muñiz, *op. cit.*, pág. 144.

██ La culpa es aquella desviación de una conducta esperada del hombre prudente y razonable en las circunstancias particulares del caso. "El derecho le sanciona la ligereza, descuido, pereza, o torpeza con la cual actúa el sujeto en el discurrir de sus actividades normales." Nevares-Muñiz, *op. cit.*, pág. 146. Cuello Calón, *op. cit.*, pág. 466, establece que existe culpa "cuando obrando sin intención y sin la debida diligencia se causa un resultado dañoso, previsible y penado por ley".

██ Para que exista culpa es necesario: (1) que exista una acción no intencional y voluntaria, (2) que la persona haya realizado el acto sin la prudencia requerida al hombre prudente y razonable en situaciones similares, y (3) que el resultado dañoso haya podido ser previsto por la persona que actúa. Nevares-Muñiz, *op. cit.*, págs. 146–147; Cuello Calón, *op. cit.*, págs. 466–467.

██ Sin embargo, la culpa no se da en términos tan abstractos, sino que se manifiesta en cuatro (4) modalidades: *imprudencia, negligencia, impericia* e *inobservancia de reglamentos y leyes.*

■ Se ha definido la imprudencia como la realización de un acto que no corresponde a la conducta que exhibiría el hombre prudente y razonable. "La imprudencia supone una actividad positiva, se refiere al obrar irreflexiblemente sin precaución ni cautela." Cuello Calón, *op. cit.*, pág. 474.

■ En contraste, la negligencia supone un no hacer; equivale a descuido. Es la omisión sin la atención requerida en casos similares. Al condenar a una persona bajo la modalidad de omisión negligente se le castiga "por un tolerar o un no actuar en ocasiones en que está obligado por la ley a actuar si quiere ser considerado por el ordenamiento como una persona razonable, madura y responsable de sus actos". Nevares-Muñiz, *op. cit.*, pág. 148.

■ La sociedad ha establecido una presunción respecto a la habilidad que tienen algunos profesionales que han recibido adiestramiento especializado al efecto. Si no se realiza el oficio, profesión u ocupación con la debida prudencia se estará bajo la modalidad de impericia. "Es necesario señalar que no debe confundirse la impericia con las modalidades anteriormente descritas de la imprudencia y la negligencia: el acto imperito puede involucrar tanto acciones negligentes como acciones imprudentes, si se mira desde un estricto punto de vista, como se denota claramente del ejemplo de un médico que acepta hacer una operación para la cual no está preparado. Lo que distingue a la impericia de las modalidades arriba mencionadas es que se produce un acto culposo bajo la forma de un oficio, profesión u ocupación para la cual se presupone preparado al individuo". Nevares-Muñiz, *op. cit.*, pág. 149. *Pueblo v. Rivera Rivera*, 123 D.P.R. 739 (1989).

■ Otra modalidad de la culpa es aquella conocida como incumplimiento de reglamentos. Generalmente se ve en los casos de reglamentos que tienden a la seguridad y a la

normal convivencia de las personas. Cuello Calón, *op. cit.*, pág. 473.

 Hemos visto que aun con orígenes distintos, tanto el derecho anglosajón como el derecho civil, en su desarrollo contemporáneo, han establecido la diferencia existente entre la negligencia requerida para lograr una convicción penal y aquella necesaria para una acción de daños y perjuicios. Se ha reconocido que el grado de negligencia requerida en casos de naturaleza penal es mayor que el exigido cuando se trata de acciones civiles. Perkins y Boyce, *op. cit.*, págs. 840–849; J. Santos Briz, *La Responsabilidad Civil*, 3ra ed., Madrid, Ed. Montecorvo, 1981, págs. 80–87; S. Soler, *Derecho Penal Argentino*, Buenos Aires, Tipográfica Editora Argentina, 1956, T. II, págs. 138–142.

Luego de esta exposición doctrinal sobre las formas de culpabilidad en el derecho angloamericano y la tradición civilista, pasemos a considerar la situación en nuestro ordenamiento penal.

## III

 Nuestra definición de "intención" proviene del *common law*. Como bien señala la profesora Nevares-Muñiz, "[p]ara explicar la intención general descrita en el artículo 15, C.P., no puede acudirse a la doctrina civilista, sino a la del *common law*, donde tiene su origen y en particular al principio de *versari in re illicita*, según evolucionó en la doctrina de que toda persona es responsable por las consecuencias naturales y probables de sus actos". Nevares-Muñiz, *op. cit.*, pág. 158.

 De hecho, es erróneo pensar que nuestra intención equivale al dolo civilista porque no hay una correspondencia exacta entre los grados de intención requeridos en nuestro ordenamiento y las categorías de dolo de la tradición civi-

lista. "[L]a identificación entre dolo directo y eventual por un lado, y la intención específica y general . . . por el otro, no siempre es correcta, ya que la sistematización del derecho civilista podía dar como resultado el que delitos realizados con dolo directo fuesen clasificados como delitos de intención general por el ordenamiento puertorriqueño." Nevares-Muñiz, *op. cit.*, pág. 145.

■ Sin embargo, hemos adoptado las categorías de culpa delineadas por la tradición civilista. Nuestro Art. 16 del Código Penal establece la negligencia criminal cuando se "ha producido un resultado delictuoso sin quererlo, por imprudencia o descuido, o falta de circunspección o impericia o por inobservancia de la ley". 33 L.P.R.A. sec. 3063. De manera que "la negligencia puertorriqueña con sus modalidades de imprudencia[,] descuido, impericia, falta de atención o inobservancia de leyes y reglamentos equivale a la culpa civilista". Nevares-Muñiz, *op. cit.*, pág. 149.

■ Sin embargo, en nuestro derecho penal se requiere un grado mayor de negligencia para sostener una convicción que la necesaria bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. *Pueblo v. Rivera Rivera*, supra; *Pueblo v. Rodríguez*, 47 D.P.R. 600 (1934); *Pueblo v. Rodríguez*, 70 D.P.R. 23, 29 (1949); *Pueblo v. López*, 77 D.P.R. 607 (1954). Véase, también, D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 31.

En el caso de autos los apelantes nos señalan que nuestro ordenamiento penal no permite que a varias personas se les acuse de dar muerte a un ser humano mediante negligencia. Argumentan que de una interpretación integral de los Arts. 14, 16 y 86 del Código Penal, 33 L.P.R.A. secs. 3061, 3063 y 4005, se infiere que no puede existir común concierto y acuerdo para cometer delitos de negligencia. No tienen razón.

█ El Art. 86 del Código Penal, 33 L.P.R.A. sec. 4005, dispone que:

Toda persona que obrando con negligencia o que al realizar un acto ilegal que no constituyere delito grave, ocasionara la muerte a otra, será sancionada con pena de reclusión por un término fijo de un (1) año y ocho (8) meses.

Se ha interpretado que bajo la segunda modalidad debe tratarse de un acto considerado como delito menos grave. *Manual de instrucciones al jurado*, aprobado por el Tribunal Supremo de Puerto Rico, 27 de marzo de 1980, pág. 128. Bajo la primera modalidad, la muerte debe ser el resultado de un acto u omisión negligente.

█ Un análisis desapasionado y objetivo de los artículos señalados revela lo erróneo del planteamiento de los apelantes. El homicidio involuntario bajo la modalidad de negligencia solamente requiere que se haya causado la muerte a un ser humano mediante un acto u omisión negligente. Es decir, la forma de culpabilidad requerida es la negligencia criminal, bajo alguna de las modalidades delineadas por la tradición civilista, y no la intención general. En el caso ante nos las modalidades aplicables son la imprudencia y el descuido o falta de circunspección. Es un dejar de hacer aquello exigido al hombre prudente y razonable en circunstancias similares. Sin embargo, esta forma de culpabilidad no excluye que varias personas *actuando en conjunto, sin querer el resultado de su acto negligente,* causen la muerte a una persona.

█ Normalmente el común concierto y acuerdo se refiere a aquellos delitos que requieren la intención general como forma de culpabilidad o aquella intención específica que contienen algunos delitos en nuestro Código Penal. La alegación de común concierto y acuerdo es necesaria para implicar a coautores del delito que no han participado activa-

mente en la comisión del mismo. Sin embargo, esto no excluye de su ámbito el común concierto y acuerdo en delitos por negligencia.

■ En Estados Unidos se ha establecido que hay la posibilidad de que exista un común concierto y acuerdo para delitos de negligencia por la existencia de diferentes grados de responsabilidad: cómplices, autores y conspiradores. Aunque los tribunales no han sido consistentes al referirse al asunto,[5] lo cierto es que puede existir un acuerdo bajo la modalidad de homicidio involuntario al realizar un acto negligente aunque no bajo la modalidad de acto ilegal.[6] Véase W.R. LaFave y A.W. Scott, *Substantive Criminal Law*, Minnesota, West Publising Co., 1986, Vol. 2, Sec. 6.7, págs. 149–152.

A igual determinación han llegado otros tratadistas. Bajo el concepto de "culpa civilista" se ha sostenido que:

> . . . [E]n estas infracciones es posible una cierta cooperación, por ejemplo, en el caso de dos personas que manejan imprudentemente un arma cargada que se dispara y hiere a un tercero; o cuando el viajero induce al conductor del automóvil a lanzarlo a una velocidad vertiginosa, en ambos casos uno coopera a la acción del otro, pero no al resultado, pues en esta clase de delitos es esencial que el resultado no sea querido. Cuello Calón, *op. cit.*, T. I, Vol. 2, pág. 664.

Jiménez de Asúa, al enfrentarse al problema, establece que:

> El problema de la culpabilidad plantea un asunto sobremanera importante y debatido: la complicidad en la culpa. A me-

---

(5) Véanse, por ejemplo: *State v. Di Lorenzo*, 83 A.2d 479 (Conn. 1951); *People v. Turner*, 336 N.W.2d 217 (Mich. App. 1983); *State v. McVay*, 132 A. 436 (RI 1926).

(6) Bajo la modalidad de acto ilegal no es necesario el común concierto y acuerdo porque cualquier participación en un acto ilegal constitutivo de delito menos grave convierte a la persona en coautor del delito y, por lo tanto, de la muerte directamente relacionada en la comisión de ese delito.

nudo se citan ejemplos de aparente codelincuencia en los actos negligentes: El que maneja el automóvil es excitado por el amigo que lleva junto a sí, para que corra y adelante el coche que se ve en lontananza. Si se atropella al campesino que cruza la carretera se dirá que ha habido entre el conductor y el viajero una codelincuencia, porque ésta exige, no el acuerdo para el acto, sino para la actuación del resultado típicamente injusto. El que aconseja correr y el que empuja con su pie el acelerador sólo están de acuerdo en la velocidad. Ahora bien; la esencia de la culpa está en la negligencia y no en el resultado, y en tal sentido no hay nada que se oponga en muchos Códigos penales a la participación en la culpa como, en cambio, impedía la tentativa en esa especie de la culpabilidad. La instigación, sobre todo, parece posible . . . . L. Jiménez de Asúa, *La ley y el delito: principios de Derecho Penal*, 5ta ed., Buenos Aires, Ed. Sudamericana, 1967, pág. 505.

■ En Puerto Rico no ha sido necesaria la alegación de común concierto y acuerdo cuando se cometen delitos cuya forma de culpabilidad requerida es la negligencia criminal debido a que nuestro Código Penal incluyó en su Art. 35 a los cómplices como coautores. Éste categoriza como coautores a:

(a) Los que toman parte directa en la comisión del delito.

(b) Los que fuerzan, provocan, instigan, inducen o ayudan a otra persona a cometer el delito.

(c) Los que se valen de una persona inimputable para cometer el delito.

(d) Los que con posterioridad a la comisión del delito ayudaren a los que tomaron parte directa en la comisión del delito en cumplimiento de una promesa anterior a dicha ejecución.

(e) Los que cooperaren de cualquier otro modo en la comisión del delito. 33 L.P.R.A. sec. 3172.

Por lo tanto, cualquier persona que haya incitado a la realización de un acto negligente que conlleva responsabilidad penal será coautor del mismo.

En el caso ante nos el común concierto y acuerdo se refiere a la planificación y anuencia de todos los acusados,

miembros del grupo directivo de Las Panteras, para realizar las actividades programadas para el campamento de iniciación. La legitimidad de Las Panteras como una organización afiliada al *Air Force R.O.T.C.* y del campamento celebrado no es determinante en este caso, pues se trata de homicidio involuntario bajo la modalidad de acto negligente. Recuérdese que el acto negligente es en sus inicios un acto legal, pues si se tratara de un acto ilegal aplicaría la segunda modalidad del delito.

Como parte de su argumento, los apelantes señalan que "el término del concierto y común acuerdo equivale a la conspiración que reconoce el derecho penal". Alegato de los apelantes, pág. 38. Argumentan que este tipo de conducta requiere los elementos de intención y conocimiento. A falta de éstos, en el caso ante nos, la acusación no imputa delito.

De ninguna manera la acusación puede referirse a un común concierto y acuerdo para ocasionar la muerte a Arnaldo Mercado, como sugieren los apelantes. Adoptar esa tesis equivaldría a establecer la intención criminal requerida en el asesinato en segundo grado. Recuérdese que en delitos de negligencia el resultado no puede ser querido. No podemos aceptar los argumentos de los apelantes. De otro modo, estaríamos permitiendo que personas que ayudaron a la comisión del delito evadan su responsabilidad por un mero tecnicismo.

■ Los acusados participaron y supervisaron esta iniciación y estaban obligados a actuar frente a la situación ocasionada por sus propios actos. La prueba del Ministerio Público estableció, más allá de duda razonable, que la víctima murió a consecuencia del daño físico que sufrió durante la brutal iniciación realizada por los apelantes. La negligencia crasa de los acusados al actuar con total menosprecio de la seguridad, la dignidad y la vida de Arnaldo Mercado fue la causa de su muerte. Mercado no fue adecuadamente alimentado, tampoco se le suministró los líquidos requeridos por su

cuerpo ni se le permitió descansar el tiempo requerido, y tuvo que someterse a ejercicios físicos extenuantes. Además, desfiló prueba a los efectos de que en algunos momentos del campamento Arnaldo Mercado fue agredido por los acusados, miembros del cuerpo directivo de Las Panteras. Durante la cadena de actos negligentes que le causaron la muerte al joven Mercado siempre estuvo presente por lo menos uno de los acusados. En ningún momento los supervisores le brindaron los primeros auxilios que requerían sus lesiones. Tampoco lo llevaron a recibir la atención médica que necesitaba. Aún al concluir la iniciación, lo cargaron en camilla y lo dejaron gravemente enfermo en la casa de uno de los cadetes. De modo que aun cuando partiéramos de la premisa equivocada y concluyéramos que no existe común concierto y acuerdo en delitos de negligencia, lo cierto es que quedó demostrado por la evidencia desfilada la responsabilidad individual de cada acusado. Todos son igualmente responsables por la muerte de Arnaldo Mercado.

## IV

Como segundo señalamiento de error los apelantes presentan el que no se haya impartido al Jurado instrucciones sobre la defensa de error de hecho y consentimiento.

El Art. 19 del Código Penal, 33 L.P.R.A. sec. 3092, establece que "[n]o incurre en responsabilidad la persona cuya acción u omisión respondiere a un error esencial de hecho que justifique la ausencia de toda intención o negligencia". Para que cobre vigencia esta causa de exclusión de responsabilidad el error de hecho tiene que ser esencial e invencible.

Un error es esencial cuando puede clasificarse como error sobre el tipo o error de prohibición. El error sobre el tipo es aquel que recae sobre los elementos constitu-

tivos del delito. El error de prohibición se refiere a una creencia equivocada de que se está actuando conforme con la ley o a una causa de justificación que en realidad no existía. La profesora Nevares-Muñiz nos ilustra con los ejemplos siguientes:

Si A le dispara a B creyendo que está muerto, cuando en realidad no lo está, se trata de un error esencial, ya que el que la víctima sea una persona viva es un elemento constitutivo del delito de asesinato. Aquí es error sobre el tipo. En cambio, sería un error esencial pero de prohibición, si C le dispara a D bajo el pensamiento equivocado de que D le va a agredir, excediéndose en la agresión, cuando en efecto no era necesario. Este último se conoce como una legítima defensa putativa. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General, op. cit.*, pág. 178.

■ Es invencible el error "cuando no hubiera podido evitarse a pesar de las diligencias empleadas por el actor, que se comporta como una persona prudente y razonable. En cambio, el error sería vencible, y no exime de responsabilidad penal del delito que se cometa, si la persona hubiera podido evitar el resultado, de haber ejercido la debida diligencia". Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado, op. cit.*, pág. 35.

Alegan los apelantes que "no serían responsables penalmente si al ver a Arnaldo Mercado en su desempeño en la caminata y en el resto del campamento, éstos estaban bajo la creencia honesta y razonable de que éste lo que estaba era cansado, al igual que los otros dos cadetes, aunque un poco más que éstos, y desconocían por completo que éste presentara una condición de salud de cuidado caracterizada por un fallo renal debido a rabdiomólisis". Alegato de los apelantes, pág. 28. Parece que los apelantes olvidan que sus propios actos negligentes (falta de alimentación, de cuidado, de descanso y el someterlo a extenuantes ejercicios físicos) fueron la causa de la muerte. La creencia de que Arnaldo Mercado

solamente estaba cansado no justificaba los actos negligentes de los apelantes. De manera que no se trata de un error de tipo, donde está ausente un elemento constitutivo del delito. Tampoco es un error de prohibición, donde genuinamente el actor piensa que está actuando correctamente, ni es un error invencible porque con la debida diligencia hubiesen podido evitar el resultado.

En casos de delitos de negligencia la defensa de error de hecho no está disponible si precisamente la esencia de la negligencia consiste en no percatarse del error o en la falta de previsión. Es decir, el actor no es consciente del riesgo aunque debería serlo. Esa falta de conciencia se desvía de lo que un hombre prudente y razonable hubiera previsto. Véanse: *Williams v. State*, 680 S.W.2d 570 (Tex. App. 13 Dist. 1984);(7) Perkins y Boyce, *op. cit.*, pág. 1049. En el caso ante nos levantar la defensa es un contrasentido. No procedía que se impartieran instrucciones a esos efectos.

## V

Los apelantes solicitaron que se instruyera al Jurado de la forma siguiente: "[s]i las damas y caballeros del jurado entendiesen por el resultado de la prueba que las actividades

---

(7) En este caso el acusado cambiaba el pañal a un bebé. Cuando fue a limpiarlo, decidió meterlo a la bañera y dejó el chorro de agua caliente corriendo, lo que causó serias quemaduras al bebé. El tribunal, al rechazar la defensa de error de hecho planteada, se pronunció de la manera siguiente:

"Una persona que actúa a base de una creencia fundamentada negligentemente que resulta errónea, actúa negligentemente. Es ilógico que proceda esta defensa en un acto de negligencia criminal porque el error de hecho está comprendido en la definición de negligencia criminal. La negligencia criminal se manifiesta en la creación de un riesgo inadvertidamente; no requiere del juzgador que determine si el actor debía estar consciente del riesgo .... La conducta del apelante se mide contra una norma objetiva, aquella del hombre prudente y razonable. Por lo tanto, por su propia naturaleza, la defensa de error de hecho es incongruente con la definición de negligencia criminal." (Traducción nuestra.) *Williams v. State*, 680 S.W.2d 570, 579 (Tex. App. 13 Dist. 1984).

llevadas a cabo por Arnaldo Mercado Pérez durante el campamento celebrado en los días 26 al 30 de diciembre de 1983, fueron efectuados (sic) por éste voluntariamente, o si tuviesen duda razonable y fundada, sobre si ello fue así o no, será vuestro deber rendir un veredicto de no culpable". Alegato de los apelantes, pág. 25.

La petición de la referida instrucción se funda en que las actividades realizadas por ellos constituían ejercicios físicos fuertes análogos a deportes y que, por lo tanto, procedía la defensa de consentimiento. Argumentan que este es un caso claro para aplicar la excepción a la norma general reconocida en casos de deportes o ejercicios físicos fuertes.

 Generalmente la defensa de consentimiento no está disponible en casos de naturaleza criminal. Solamente procede si un elemento constitutivo del delito es la ausencia del consentimiento. LaFave y Scott, *Substantive Criminal Law, op. cit.*, págs. 687–689. La razón aducida para la referida norma es que la comisión de un delito va más allá del perjuicio específico causado. Al cometer un delito se atenta contra el orden público establecido, de modo que no procede que el propio perjudicado autorice el daño infligido. Íd.

 Sin embargo, se ha creado una excepción cuando se trata de lesiones sufridas en deportes. En estos casos se ha permitido levantar la defensa de consentimiento cuando

(1) la persona afectada es capaz de prestar consentimiento válido;

(2) la persona presta consentimiento válido voluntaria e inteligentemente;

(3) la actividad es lícita, y

(4) se siguen las normas establecidas para el deporte.

Si no se cumplen con todos los requisitos, el consentimiento no será eximente de responsabilidad. LaFave y Scott, *op. cit.*; 2 *Wharton's Criminal Law* Sec. 151, pág. 232

(1978). Véanse, además: J. Hallowell y R. Meshbesher, *Sports Violence and the Criminal Law*, 13 (Núm. 1) Trial 26 (1977); G. Flakne y A. Caplan, *Sports Violence and the Prosecution*, 13 (Núm. 1) Trial 33 (1977).

En las jurisdicciones norteamericanas donde se ha estatuido el *hazing*[8] como delito, los tribunales han concluido que no puede levantarse el consentimiento como defensa. *People v. Lenti*, 260 N.Y.S.2d 284 (1965);[9] *Bartell v. State*, 82 N.W. 142 (Wis. 1900).

A igual conclusión se ha llegado en los países con una tradición civilista. Por regla general, el consentimiento de la víctima no es defensa, salvo que la falta de consentimiento sea elemento del delito. Cuello Calón, *op. cit.*, págs. 406–407.

En casos de lesiones causadas en deportes y muerte por razón de ejercicios deportivos violentos se ha concluido que:

Cuando no se obre con la debida prudencia y cautela que suponen la observancia de las reglas lícitas del deporte, puede existir un delito de lesiones (o de homicidio) por imprudencia, a menos que el ejercicio deportivo se utilice como medio de encubrir una voluntad criminal encaminada a causar un mal corporal (o la muerte), en cuyo caso el culpable respondería de

---

[8] El diccionario define *hazing* como: "[h]acer a uno víctima de petardos, chanzas o chascos." Velázquez, *Dictionary of the Spanish and English Languages*, Nueva York, Ed. Appleton, 1973, pág. 296.

[9] El tribunal se expresó de la manera siguiente:

"Los actos realizados por los fraternos no van a ser condonados por este Tribunal. De hecho, este Tribunal se engrandece cuando revela que su conciencia está perturbada por la conducta que han exhibido los acusados y los miembros de la fraternidad; su conducta en el trato dado a sus contemporáneos solamente puede ser caracterizada como sadista, inmoral y bárbara. Los peligros inherentes en los procedimientos y prácticas de "hazing" no se pueden eliminar a menos que la sociedad, en cooperación cercana con los administradores escolares, desarrollen políticas y actividades que demuestren que se ha tomado conciencia del daño y un deseo de eliminarlo. Inicialmente, debe existir un esfuerzo comunitario para que la legislatura apruebe una ley lo suficientemente clara para que se conozcan los actos prohibidos por ésta y para que exista una notificación adecuada de las actividades criminales prohibidas por el estatuto." (Traducción nuestra.) *People v. Lenti*, 260 N.Y.S.2d 284, 288 (1965).

un delito doloso. Cuello Calón, *op. cit.*, T. II, Vol. 2, pág. 558. Véase, además, J.M. Rodríguez Devesa, *Derecho Penal Español: Parte Especial*, 9na ed., Madrid, Imprenta Artes Gráficas Carasa, 1983, págs. 144 y 149.

Acertadamente, Puig Peña concluye que:

Maggiore, con razón, sostiene que la vida y la integridad corporal son bienes indisponibles; ello aparte de que es indudablemente cierto que ningún jugador quiere morir o ser herido; luego el consentimiento es irrelevante o inoperante. En el Derecho español esta tesis [la del consentimiento de la víctima] es insostenible . . . . F. Puig Peña, *Derecho Penal: Parte Especial*, Madrid, Ed. Rev. Der. Privado, 1964, T. IV, pág. 24.

Además, no sólo existe responsabilidad penal en los jugadores, "sino en los organizadores que no tomaron las precauciones debidas . . .". Puig Peña, *op. cit.*, págs. 25–26.

■ Nuestro ordenamiento penal sigue las pautas establecidas tanto en las jurisdicciones federales como en la tradición civilista y no considera el consentimiento como una de las causas de exclusión de responsabilidad. Sin embargo, es aceptada cuando el delito en cuestión requiere la falta de consentimiento como un elemento constitutivo de éste. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General, op. cit.*, pág. 229. Si el delito queda tipificado independientemente de la existencia del consentimiento, no procede la defensa. *Pueblo v. Avilés*, 54 D.P.R. 292 (1939); *Pueblo v. Vargas Ramírez*, 84 D.P.R. 225 (1961); *Cooperativa Cafeteros de P.R. v. Tribunal Superior*, 76 D.P.R. 352 (1954).

En su ilustrada comparecencia, el Procurador General correctamente afirma que en el caso de autos el delito imputado (homicidio involuntario) no requiere como un elemento constitutivo que exista ausencia de consentimiento. Se configura el delito cuando se ocasiona la muerte a una persona "mediante la realización de un acto negligente", independientemente de que haya habido consentimiento. Nadie

puede consentir válidamente a actos que atentan contra su integridad física. Permitir lo contrario sería una burla a las normas de sana convivencia social de nuestra civilización.

■ Aun cuando se considere que las actividades realizadas por los apelantes son deportes o actividades análogas, en el caso de autos no procede que el consentimiento sea considerado como defensa. Al aplicar los criterios expuestos anteriormente, concluimos que aunque Arnaldo Mercado inicialmente prestó su consentimiento voluntaria e inteligentemente y que la actividad era lícita,(10) se excedieron en su ejecución al no proveer una alimentación básica durante la iniciación, al requerirle una serie de ejercicios que pusieron en peligro su vida y al negarle el descanso requerido por las actividades de la funesta iniciación. *Mercado no pudo haber prestado un consentimiento válido para someterse a los excesos de un ritual sádico-masoquista que viola la dignidad del ser humano y que le ocasionó la muerte al comienzo de sus estudios universitarios.*

## VI

Los apelantes señalan que la admisión de fotografías del lugar donde se celebró el campamento y del cadáver de Arnaldo Mercado fue un error substancial que conlleva la revocación de la sentencia. Alegan que las mismas produjeron desorientación, confusión y prejuicio indebido en el ánimo del Jurado y que no reflejaban fielmente la condición en que se encontraba Arnaldo Mercado al finalizar el campamento.

■ Reiteradamente hemos validado la admisión de fotografías como parte de la prueba documental, especial-

---

(10) La licitud de la actividad no fue probada. Debía haber una autorización escrita para celebrar el campamento. En este caso, dicha autorización no existía. Solamente había una petición verbal hecha al capitán Rosado.

mente cuando corroboran el testimonio de los testigos presentados. *Pueblo v. Márquez*, 67 D.P.R. 326 (1947); *Pueblo v. Torres*, 75 D.P.R. 231 (1953); *Pueblo v. Fournier*, 80 D.P.R. 390 (1958). En el caso ante nos, las fotografías del lugar donde se celebró el campamento corroboran partes esenciales de los testimonios presentados. Era necesaria su admisión para que el Jurado tuviera un cuadro fáctico completo.

■ Los apelantes nos llaman la atención al hecho de que las fotografías del cadáver de Arnaldo Mercado fueron tomadas el 5 de enero, después de varios días de finalizado el campamento, y que por lo tanto no son un reflejo fiel de las condiciones en que éste se encontraba el 30 de diciembre. No obstante, dichas fotografías eran el único medio gráfico disponible para que el Jurado visualizara lo narrado por los doctores Campos y Justiniano, quienes atendieron a Arnaldo en la sala de emergencia. En las fotos se podía apreciar la magnitud de las heridas sufridas, las quemaduras y la condición general en que se encontraba Arnaldo Mercado. Los jurados conocían perfectamente cuándo había finalizado el campamento y cuándo se tomaron las fotografías, por lo tanto estaban en posición de aquilatar la prueba presentada. Tampoco había transcurrido tanto tiempo como para que las fotos presentaran una imagen distorsionada de lo ocurrido. Recordemos que al Jurado no podemos atribuirle una sensibilidad extrema y el mero hecho de que una fotografía pueda impresionar desfavorablemente al Jurado no justifica su exclusión. *Pueblo v. Rivera Romero*, 83 D.P.R. 471 (1961).

Por último, el argumento de que no se probó la culpabilidad más allá de duda razonable es totalmente inmeritorio. El Jurado es el más indicado para otorgar credibilidad y dirimir conflictos de prueba. Son éstos quienes normalmente están

en mejor condición de aquilatar la prueba, pues gozan de la oportunidad de ver y escuchar directamente a los testigos. *Pueblo v. Pellot Pérez*, 121 D.P.R. 791 (1988).

En el caso ante nos, éstos creyeron la prueba presentada. Tanto la prueba documental como testifical convenció al Jurado de que los apelantes fueron negligentes y que dicha negligencia fue la causa de la muerte de Arnaldo Mercado. "[D]e ordinario, no intervendremos con el veredicto condenatorio emitido por un jurado . . . en 'ausencia de pasión, prejuicio o error manifiesto' en la apreciación que de la prueba realizaron los mismos." *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 654 (1986). Véanse: *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988); *Pueblo v. Rivera Rodríguez*, 123 D.P.R. 467 (1989).

*Se confirmará la sentencia recurrida.*

La Juez Asociada Señora Naveira de Rodón concurre con el resultado sin opinión escrita. El Juez Asociado Señor Alonso Alonso no intervino.