EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAIMUNDO SANTIAGO, acusado y apelante.

Núm. 7336.—*Sometido:* Enero 12, 1939. *Resuelto:* Enero 27, 1939.

*R. Martínez Nadal, C. H. Juliá* y *Gladys Lasa,* abogados del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

El 21 de marzo de 1938 el Juez del Distrito de Arecibo dictó una orden decretando el arresto de Raimundo Santiago y su comparecencia ante la corte el primero de abril siguiente para explicar las razones que tuviera a virtud de las cuales no debiera castigársele por desacato a la corte cometido en el dicho día al declarar falsamente bajo jura-

mento en el caso de *El Pueblo* v. *Cruz Román Rodríguez* por asesinato en primer grado.

Compareció en efecto Santiago y alegó como cuestión de derecho que la orden era insuficiente y como cuestión de hecho

". . . que si alguna contradicción existe entre las dos declaraciones prestadas por él ante esa Hon. Corte, cuando fué llamado a declarar para que dijese la verdad de lo que él había observado el día en que ocurrió el hecho que dió motivo a la acusación del Hon. Fiscal contra Cruz Román y José Lugo, ella se debió al tiempo transcurrido entre su primera y segunda declaración; que no se le dió una verdadera oportunidad de refrescar su memoria, pues aún cuando el taquígrafo le leyó su primera declaración, las palabras de él las oyó estando en estado de ánimo tal, por su condición de funcionario público, y pensar, como pensó, que su aparente contradicción podría interpretarse con detrimento a su prestigio y honradez como tal funcionario."

Se practicó prueba de cargo y de descargo y la corte en junio 24, 1938, dictó sentencia condenatoria. No conforme, Santiago apeló. Sostiene en su alegato que la sentencia es contraria a la prueba. En su informe el fiscal de esta Corte Suprema muestra su conformidad con el apelante y solicita la revocación de la sentencia.

Ésta dice:

"Este proceso se basó en la Ley núm. 9 de 1911, proveyendo un castigo sumario por delito de perjurio cometido en Corte abierta y para otros fines.

"El acusado declaró como testigo del Fiscal en el caso del Pueblo v. Cruz Román Rodríguez y otro, por delito de Asesinato. En ese caso hubo que celebrar dos vistas porque los acusados solicitaron juicio por separado.

"En el segundo juicio el testigo Raimundo Santiago, que es el acusado en este caso de desacato por perjurio en Corte abierta, declaró que al oír un tiroteo corrió al sitio donde sonaron los disparos y que vió dos hombres (los acusados) que corrían por un callejón que está detrás del pueblo y que sale en dirección a la carretera de Barceloneta, y que a uno de ellos lo vió con un arma.

"En el primer juicio el acusado en este proceso, Raimundo Santiago, había declarado que vió a los dos acusados de Asesinato o sea, José Lugo y a Cruz Román, con un arma a cada uno.

"Al notar la contradicción el Fiscal le dió una oportunidad al acusado en este proceso para que rectificara su declaración, indicándole que él había declarado en el primer proceso que ambos acusados tenían un arma cada uno, y hasta se le leyó por el taquígrafo su declaración anterior.

"A pesar de ello el acusado en este caso, Raimundo Santiago, no rectificó y se concretó a decir que si lo había declarado no se acordaba.

"En la vista de este proceso de desacato por perjurio se presentó como prueba la segunda declaración certificada por el taquígrafo, y para ganar tiempo el acusado admitió y se hizo constar en récord, que él había declarado en el primer juicio que ambos acusados de Asesinato tenían armas. En el primer juicio uno de los acusados de Asesinato salió condenado; y en el segundo juicio el otro salió absuelto, siendo precisamente el que dijo Raimundo Santiago, que no portaba revólver.

"La defensa levantó una cuestión legal consistente en qué no se expresaba en la orden dictada por la Corte que dió motivo a este proceso, que las palabras que se le atribuyen al acusado fuesen falsas y que las dijera sabiendo su falsedad.

"En un procedimiento de esta índole, si bien al acusado hay que notificarle por una orden el motivo del proceso, no creemos que rijan las mismas reglas estrictas que en una acusación o denuncia; pero aun aceptando que así fuera, en la orden dictada por esta Corte se dice claramente que el testigo prestó juramento de decir verdad y que contrario al mismo declaró que vió dos hombres correr del sitio de los sucesos y que uno solo portaba revólver, a pesar de que había declarado el día 1 de noviembre de 1937, en otro juicio, en el mismo caso, que había visto a los dos hombres portando revólveres en la mano.

"Que en estas frases claramente se imputa que hubo una intención a sabiendas de declarar contrario a su juramento, porque se trata de dos declaraciones juradas y son sustancialmente contradictorias, y como cuestión de lógica, hay que sentar como base, por lo menos prima facie, que una de ellas no era verdad.

"Además, la orden fué dictada después que se dió la oportunidad al acusado de que explicara su conducta y de haberle leído la primera declaración por boca del taquígrafo. Su alegación ahora de que no se dijo en la orden que él sabía que era falso lo declarado, es puramente académica.

"La naturaleza de este caso tiene alguna gravedad, sobre todo, tratándose de un policía; pero teniendo en cuenta que el acusado

es un funcionario que ha prestado por muchos años servicios en el gobierno, y según informes, en la Aduana, la Corte actuará en forma benigna y favorece cualquier gestión del Fiscal, tendiente a que el Coronel de la Policía no tome una medida muy drástica con respecto al funcionario. No obstante, nuestro fallo tiene que ser condenatorio, porque sería un precedente fatal una absolución en este caso.

"Por las expuestas razones, se declara al acusado culpable y como él pidió que se dejara para hoy dictar sentencia, se procede a dictarla condenándole a pagar $50.00 de multa o en su defecto un día de cárcel por cada dólar que deje de satisfacer, con las costas."

Sobre la cuestión de derecho que levantara, nada expresa el apelante en su alegato. Se limita al análisis de la evidencia y a argumentar que no es suficiente para sostener el fallo condenatorio apelado. No estamos conformes. Hemos examinado dicha evidencia y a nuestro juicio es suficiente.

 El hecho de dos declaraciones prestadas por la misma persona—el acusado—bajo juramento, que difieren en un extremo substancial, es claro y se admite por el propio apelante. Su defensa consiste en tratar de demostrar la falta de intención criminal en su actuación, a cuyo efecto dice:

"Ahora bien, ninguna parte en la ley establece que pueda procesarse por perjurio a una persona porque no recuerde parte esencial de los hechos que captaron, palparon o percibieron sus sentidos.

"En toda la parte de su declaración que motivó el supuesto desacato por perjurio, el acusado y apelante se concretó a manifestar que no recordaba haber declarado que el individuo Cruz Román Rodríguez llevase un revólver en la mano el día de autos. La mente humana es susceptible de flaquezas, el tiempo es un agente abonador de dichas flaquezas, y es natural que en casos de esta índole se tomen en consideración las condiciones intelectuales, la intención específica, el tiempo transcurrido, y las circunstancias todas para poder determinar si una persona ha falseado la verdad o trata de ocultarla, escudándose en una evasiva, a los efectos de poder determinar la responsabilidad criminal de dicha persona en un delito de esta índole."

Convenimos en que es necesario que se demuestre la intención criminal. Sin ella no existiría el delito. Pero creemos que esa intención surge fuera de duda razonable de la propia declaración, de las mismas explicaciones del acusado. La

intención se manifiesta por las circunstancias relacionadas con el delito, y el sano juicio y discreción del acusado. Se reputan de sano juicio todos los que no sean idiotas, lunáticos o locos. Una intención maliciosa y criminal se presume por la manera y deliberación con que se intente o cometa un acto ilegal con el propósito de perjudicar a otro. Artículo 12 del Código Penal.

Declaró el acusado en el primer juicio por separado solicitado por uno de los dos acusados de asesinato, que los dos acusados estaban armados de revólver. El veredicto fué de culpabilidad.

Llamado el otro juicio, declaró que sólo había visto a uno de los acusados armado. Y el veredicto fué entonces absolutorio para el acusado que se estaba juzgando.

Oigamos sus propias manifestaciones. Se trata del juicio celebrado contra Cruz Román que salió absuelto.

"P. ¿Esas dos personas a quienes vió corriendo del sitio de los hechos, quiénes eran?—Desde luego, cuando los vimos eran las mismas dos personas que nos habían saludado por la mañana en el sitio del pueblo.

"P.—¿Quiénes eran?—Resultó ser José Lugo y Cruz Román.

"P.—¿Dice que cuando llegó y vió el automóvil e iban corriendo los vió correr en dirección al pueblo?—Del callejón detrás del pueblo.

"P.—¿Lo vió correr con un arma?—A José Lugo le vi el revólver.

P.—¿Y a este señor? (refiriéndose al acusado)—No pude especificar si llevaba revólver.

"P.—¿Portaban esos individuos algo en la mano?—Que viera, vi a uno de ellos con un revólver en la mano.

"P. ¿A quién?—A José Lugo.

"P.—¿Y a Cruz Román?—Si lo llevaba, no sé si lo llevaba encima, pero no lo vi en la mano.

"P.—¿Se acuerda haber declarado en el primer juicio contra José Lugo, el primero de noviembre de 1937, que le había visto un revólver a cada uno en la mano?—No recuerdo. Sé que declaré con relación a este caso que José Lugo llevaba un revólver.

"P.—¿No se acuerda haber declarado que Cruz Román llevaba un revólver en la mano?—Si lo declaré no lo recuerdo y, además, está ahí mi declaración jurada.

"Hon. Juez: ¿No declaró en el otro juicio que los dos llevaban revólveres?—Si lo declaré no recuerdo. Declaré que José Lugo llevaba revólver."

Y en el juicio anterior, en el seguido contra Lugo, Santiago por su abogado aceptó que había declarado "que había visto a los dos acusados con revólveres en las manos".

En este proceso por desacato por perjurio declaró también Santiago como sigue:

"P.—¿De manera, Santiago, que usted acepta que en el primer juicio, o sea, el que se celebró en noviembre de 1937, usted dijo que el acusado Cruz Román Rodríguez lo había visto usted correr del sitio de los hechos, por un camino, con un revólver en la mano?

"Abogado Sr. Pérez Casalduc: Señor Juez, es una cosa aceptada por nosotros.

"Hon. Juez: Ya él aceptó que los vió con revólveres.

"Abogado Sr. Pérez Casalduc: Hay que buscar si su declaración contraria fué intencionalmente.

"Hon. Fiscal: ¿Usted se acuerda que el día del juicio, en marzo 23 de 1938, se le preguntó si había declarado una cosa distinta en el primer juicio y que se le leyeron las notas taquigráficas?—Se me leyó parte de la declaración que yo presté en el primer juicio.

"P.—¿En esa declaración que se le leyó aparecía que Ud. había dicho antes que había visto con revólveres en las manos a los dos acusados cuando corrían?—Según la transcripción que hizo el taquígrafo, lo decía la declaración.

"P.—Habiéndosele refrescado ya la memoria y viendo Ud. la contradicción que había entre la declaración en el primer juicio y la declaración en el segundo, ¿por qué usted ante el Jurado en ese caso mientras estaba declarando ante el Jurado no rectificó entonces su declaración para que se diera cuenta el Jurado que usted lo que había sufrido era una equivocación al declarar al principio y no afectara su declaración primera los intereses de El Pueblo de Puerto Rico en el caso que estaba ventilándose?—Si se me hubiera dado la declaración transcrita, yo leyendo hubiera visto la diferencia; si la hubiera leído ya transcrita hubiera dicho: 'Es verdad que lo que dije aquí es'. Estaba leyendo una segunda persona, que es el taquígrafo y había transcurrido un año de un juicio al otro y son

tantas las cosas que uno tiene en su mente, que hay cosas que uno quiere decir que no las recuerda; se le puede olvidar a cualquiera persona.

"Abogado Sr. Pérez Casalduc: ¿Cuánto transcurrió desde la primera declaración hasta la última?—Un año y pico.

"A preguntas del Hon. Juez, declaró lo siguiente:

"P.—Lo que el Fiscal le preguntaba era que en el segundo juicio cuando a usted se le leyó la primera declaración, que era distinta a la segunda, ¿por qué Ud. entonces al leérsele la primera no le dijo al Jurado: 'es verdad la primera y no la segunda'?—Sr. Juez, hay momentos que uno está en un estado de ánimo, que aunque le estén diciendo frente a frente las cosas no llega a la conclusión inmediata.

"P.—¿Usted quiere decir que estaba turbado?—Turbado. Yo le voy a explicar. En la escuela, en quinto grado, con Mr. Whittemore, el esposo de la Colectora de Aduanas, yo me empeñé en decir que tres por tres eran seis y estuve como una hora y tuvieron que traerme un niño de segundo grado para que me convenciera que tres por tres nueve y después me dí cuenta que era un error.

"P.—¿No cree usted que este hecho importante, habiendo dos acusados en un hecho tan importante como ése, el haber visto a los dos con revólveres, que usted en el segundo juicio olvidara eso y dijera que solamente vió a uno, no cree usted que ése es un hecho importante?—Yo creo que es importante, pero hay que tomar en cuenta una cosa. Nosotros cuando estábamos trabajando en esa mañana, después de pasar una noche por los callejones de caña . . . fué como a las cinco o las seis de la mañana y después en la advertencia de buscar los acusados uno y otro, y tal vez puede uno haber declarado una cosa que en el hecho no la recuerde perfectamente bien."

¿Puede, una vez conocida esa prueba, sostenerse que erró el juez que la consideró suficiente para concluir que el acusado actuó con intención criminal al variar su testimonio en el segundo juicio?

Creemos que no. Si algo revelan los autos es el cuidado con que dicho juez actuó. Sufrió con la sentencia que se veía obligado a pronunciar en contra de un funcionario que parecía arrepentido de su actuación al darse cuenta de las consecuencias que para él acarreaba y que trató de explicarla lo mejor que pudo, pero supo por encima de sus sentimientos

de piedad actuar de acuerdo con el mandato de su razón que al analizar la prueba le indicaba que la única conclusión a que podía llegarse era a la de la culpabilidad del acusado.

*Procede que el recurso sea declarado sin lugar y confirmada la sentencia.*