EL PUEBLO DE PUERTO RICO, apelado, *v.* DIONEL CARMONA ROSADO y JOSÉ M. RIVERA DEL VALLE, acusados y apelantes.

*Número:* CR-93-144          *Resuelto:* 28 de octubre de 1997

*Olga E. Birriel Cardona,* abogada de los apelantes; *Carlos Lugo Fiol, Procurador General, Edda Serrano Blasini, Subprocuradora General, Marta Maldonado Maldonado* y *Miguel A. Santana Bagur, Procuradores Generales Auxiliares,* abogados del El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El Ministerio Público acusó a los policías Dionel Carmona Rosado y José M. Rivera Del Valle por *tentativa de asesinato* ante el Tribunal Superior, Sala de San Juan. Un jurado rindió el veredicto de culpabilidad y el reputado tribunal de instancia (Hon. Ygrí Rivera de Martínez, Juez) los sentenció a cumplir cuatro (4) años en probatoria.[1]

Los apelantes alegan conducta impropia por parte del Tribunal y del Ministerio Público ante el Jurado, admisión errónea de evidencia y que la prueba no sostiene el veredicto.

## I

La prueba vertida en el juicio estableció lo siguiente. Mientras los policías Carmona Rosado y Rivera Del Valle —*integrantes del grupo de Saturación de San Juan*— patrullaban el área del Club Náutico la noche del 8 de noviembre de 1991, otra patrulla informó por radio haber sido *tiroteada.* La llamada utilizó la clave de emergencia "10-50". Esto significa que peligra la vida de un policía o ciudadano. Además, solicitó ayuda a las patrullas cercanas

---

[1] El Ministerio Público acusó a otros dos (2) agentes: José González Vega, por tentatiya de asesinato, y William Narváez García, por encubrimiento. Art. 236 del Código Penal, 33 L.P.R.A. sec. 4432. El Jurado absolvió a ambos.

y describió al vehículo del cual les dispararon como un *Cadillac de color claro, que se dirigía hacia el área del Club Náutico.* E.N.P., págs. 34, 36 y 37.

Instantes después, la patrulla de Carmona Rosado y Rivera Del Valle *recibió un tiro proveniente de un vehículo similar al descrito en la comunicación.* E.N.P., págs. 28, 37–39, 75, 76 y 86–87. Consecuentemente, Carmona Rosado y Rivera Del Valle dispararon hacia el vehículo sospechoso y comenzaron a perseguirlo por el expreso Las Américas. *Durante la persecución, hubo una confusión vehicular.* Al llegar Carmona Rosado y Rivera Del Valle a la bifurcación hacia Bayamón y Caguas, el Cadillac se detuvo al lado derecho del expreso, en dirección a Bayamón. E.N.P., págs. 4, 28, 35 y 37. El "Cadillac" recibió múltiples impactos de bala, su mayoría en la parte trasera.(2) Uno de sus ocupantes resultó herido de bala. El quebrantamiento de los cristales y la intervención de la Policía le ocasionaron lesiones a los otros dos (2).

Según la prueba, el Ing. Iván Hernández Vizcarrondo, su esposa Brunilda Quiñónez Vázquez y la Sra. María Dolores Martínez salieron de una actividad en el Instituto de Cultura Puertorriqueña entre las 11:00 y 11:15 P.M., en un Cadillac de color *crema* y se dirigieron hacia Río Piedras por el Expreso Las Américas.

Cerca del Parque Central, Hernández Vizcarrondo escuchó dos (2) tiros y observó por el retrovisor muchas luces de automóviles. Subsiguientemente, *Hernández Vizcarrondo notó que un automóvil "blanco o gris claro" les pasó a gran velocidad ("como a unas 70 millas más o menos 75 millas").* E.N.P., pág. 12. Al llegar a la bifurcación Caguas-Bayamón, Hernández Vizcarrondo escuchó otra detonación que

---

(2) Las fotos del automóvil demuestran que la mayoría de los impactos fueron en el área del baúl y cristal trasero. E.N.P., pág. 82; *Exhibit*, págs. 28, 31–39, 41–43 y 46. Según el certificado del análisis químico forense, que fue sometido como evidencia por el Ministerio Público, de los treinta y dos (32) impactos de balas recibidos por el Cadillac, siete (7) fueron en el cristal trasero, siete (7) en la tapa del baúl y diez (10) en la parte trasera. *Exhibit* 27 del Pueblo.

impactó su vehículo e hirió a su esposa en la cadera.(³) Por lo tanto, *decidió acelerar hacia Bayamón para llevarla al hospital.* No obstante, los disparos continuaron por encima de su vehículo. La señora Martínez, pasajera del asiento trasero, se percató que era la Policía quien les disparaba. E.N.P., pág. 4. Por su parte, Hernández Vizcarrondo observó que la Policía estaba cerca y había prendido las luces de advertencia. Hernández Vizcarrondo optó por detenerse cerca del estacionamiento de Sears, en Plaza Las Américas. Mientras aumentaban las ráfagas de disparos, se tiró al piso del vehículo junto a sus pasajeros y comenzaron a rezar. De hecho, Brunilda Quiñónez declaró que *"todo el mundo* tiró, eran tan numerosas las detonaciones que el carro se llenó de humo dentro". (Énfasis suplido.) E.N.P., págs. 18–19.

*En el incidente participaron aproximadamente dieciocho (18) patrullas y una veintena de policías.* E.N.P., pág. 14. Dolores Martínez señaló que escuchó disparos pero que no podía precisar la cantidad y su procedencia. E.N.P., pág. 27. El automóvil recibió treinta y dos (32) tiros. Más aún, Hernández Vizcarrondo testificó que no podía identificar a los policías que les dispararon. E.N.P., pág. 6. Por su parte, el Sgto. Nicomedes Morales Morales no estaba seguro del total de patrullas responsables de dispararle al carro de Hernández Vizcarrondo. E.N.P., pág. 36. Al cesar los disparos, la Policía los sacó bruscamente del auto, los tiró al pavimento y los esposó. Luego de registrar el auto e inspeccionar el área circundante, les quitaron las esposas y los enviaron al hospital. El Sgto. Aníbal Hernández entrevistó a Hernández Vizcarrondo en el hospital. Durante la conversación el sargento Hernández se disculpó, indicando *"que había sido un tremendo error"*. (Énfasis suplido.) E.N.P., pág. 16.

---

(³) El Ministerio Público no probó mediante evidencia clara y preponderante, mucho menos mediante evidencia más allá de duda razonable, qué proyectil hirió a la Sra. Brunilda Quiñónez Vázquez ni de dónde provino.

Una llamada anónima señaló a Carmona Rosado como uno de los policías responsables de dispararle al carro de Hernández Vizcarrondo. Como consecuencia, a Carmona Rosado se le ocupó un rifle AR-15 y a Rivera del Valle se le ocupó el revólver de reglamento. E.N.P., págs. 29, 32, 34 y 77.[4]

Además de las armas ocupadas a los agentes, el Ministerio Público sometió en evidencia: cinco (5) casquillos de un revólver Magnum y dos (2) de un rifle AR-15. Éstos los recogió Hernández Vizcarrondo el día siguiente en el lugar de los hechos (E.N.P., pág. 7), y cuatro (4) fragmentos de bala encontrados por el Agente Vázquez Santiago en el Cadillac. E.N.P., pág. 42. Los análisis balísticos demostraron que los casquillos fueron disparados por las armas ocupadas a Carmona Rosado y Rivera del Valle.

El Sgto. Jerry Serrano Cosme testificó que poco después de los hechos se dirigió a la salida del expreso De Diego en respuesta a la llamada "10-50". Cerca de Plaza Las Américas y del residencial Nemesio Canales observó un auto *"que parec[ía] un Cadillac"*, con las luces prendidas, las puertas abiertas y el *motor encendido*. Más tarde, *se demostró que era un Chrysler, modelo New Yorker, de color gris, hurtado.* E.N.P., pág. 99. El informe oficial revela que dicho vehículo se recuperó a las 12:20 de la madrugada, poco después de los hechos. El dueño, Humberto Díaz, confirmó que el vehículo había sido sustraído el 7 de noviembre de 1991, un día antes, y que al día siguiente, a eso de la medianoche, la Policía lo llamó para informarle que lo habían recobrado. *Díaz notó que el auto tenía un impacto en la capota.* E.N.P., pág. 97. El análisis técnico de la Policía reflejó que se *había disparado un arma de fuego desde el interior de dicho auto.* E.N.P., págs. 98–99.

---

[4] Los policías José González Vega, Jesús Ramos Santiago y Roberto Ramírez Serrano también dispararon la noche de los hechos, por lo que se les ocuparon sus armas de reglamento, entre ellas una Carabina 30. *Exhibit* 14 del Pueblo.

## II

A tenor de los Arts. 26 y 82 del Código Penal, 33 L.P.R.A. secs. 3121 y 4001, incurre en tentativa de asesinato quien "realiza acciones o incurre en omisiones inequívocamente dirigidas" a "dar muerte a un ser humano con malicia premeditada", frustrándose su consumación por circunstancias ajenas a su voluntad. *Rivera Pagán v. Supte. Policía de P.R.*, 135 D.P.R. 789 (1994); *Pueblo v. Bonilla Ortiz*, 123 D.P.R. 434 (1989); *Pueblo v. Montoya Montoya*, 95 D.P.R. 703 (1968).

Generalmente, la intención criminal es un elemento esencial en la configuración de un delito. *Pueblo v. Miranda*, 79 D.P.R. 710 (1956); *Pueblo v. Lucret Quiñones*, 111 D.P.R. 716 (1981). La malicia es un elemento constitutivo del delito de asesinato y su tentativa. Se trata de una forma de intención que requiere ausencia de justa causa o excusa y conciencia de la naturaleza delictiva del acto. D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, San Juan, Ed. Inst. Desarrollo del Derecho, 1983, pág. 162.

La intención y el objetivo del actor y la naturaleza de la acción u omisión coinciden en ambos, el asesinato y su tentativa. La única diferencia es que en la tentativa circunstancias ajenas a la voluntad del actor impiden el resultado delictivo. *Rivera Pagán v. Supte. Policía de P.R.*, supra. Por lo tanto, *la intención de matar* es un elemento esencial del delito de tentativa de asesinato. No obstante, por su naturaleza etérea, deben atenderse las circunstancias que concurran durante el hecho delictivo para probar su existencia. *Pueblo v. Bonilla Ortiz*, supra; *Pueblo v. Montoya Montoya*, supra; *Pueblo v. Rosario Centeno*, 90 D.P.R. 874 (1964); *Pueblo v. Paló*, 80 D.P.R. 364 (1958); *Pueblo v. Tribl. de Distrito y Colón, Int.*, 74 D.P.R. 838 (1953).

Hemos establecido que "se manifiesta por las circunstancias relacionadas con el delito, y el sano juicio y

discreción del acusado. ... Una intención maliciosa y criminal se presume por la manera y deliberación con que se intente o cometa un *acto ilegal*[5] con el propósito de perjudicar a otro". (Énfasis suplido.) *Pueblo v. Santiago*, 54 D.P.R. 167, 171 (1939).

Más tarde establecimos que:

> ... En vista de la presunción, "de que todo hombre intenta y tiene por objeto las consecuencias naturales y lógicas de sus actos", ... cuando se ataca a una persona con un arma mortífera en tal forma que natural, probable y razonablemente ha de ocasionar su muerte, o poner en peligro su vida, la intención de matar se presume. (Citas omitidas.) *Pueblo v. Tribl. de Distrito y Colón, Int.*, supra, pág. 856. Véanse: *Pueblo v. Moreno Morales I*, 132 D.P.R. 261 (1992); *Pueblo v. María Vega*, 105 D.P.R. 676 (1977); *Pueblo v. Montoya Montoya*, supra.

■ Ahora bien, "[e]sta presunción puede, ... ser rebatida". *Pueblo v. Tribl. de Distrito y Colón, Int.*, supra, pág. 856. "Por eso no basta para imponer responsabilidad criminal la mera demostración de que se cometieron actos prohibidos por ley si éstos se deben a *error*, accidente, desconocimiento o ignorancia". (Énfasis suplido.) *Pueblo v. Miranda*, supra, pág. 717.

■ El Art. 19 de nuestro Código Penal, 33 L.P.R.A. sec. 3092, establece como eximente de responsabilidad penal la defensa de *error de hecho*. Este artículo dispone que "[n]o incurre en responsabilidad la persona cuya acción u omisión respondiere a un *error esencial de hecho* que justifique la ausencia de *toda intención o negligencia*". (Énfasis suplido.)[6]

---

[5] El Art. 7(17) del Código Penal define "ilegalmente" como "[t]odo acto en contravención de alguna ley, reglamento u orden". 33 L.P.R.A., sec. 3022(17).

[6] El Art. 19 del Código Penal, 33 L.P.R.A. sec. 3092, fue enmendado por la Ley Núm. 12 de 17 de febrero de 1996 (33 L.P.R.A. secs. 3092–3092b). En la actualidad dispone:

"*Artículo 19A.—Error de Prohibición.—*

"No incurre en responsabilidad penal quien realice una acción con la convicción errada e invencible de que está amparado por una causa de justificación." (Énfasis suplido.) 1996 Leyes de Puerto Rico 27.

"*Artículo 19B.—Error de Tipo.—*

■    Para invocar con éxito esta exclusión de responsabilidad penal, hay que demostrar que el error es *esencial* e *invencible*. "[E]s esencial cuando puede clasificarse como error sobre el tipo o error de prohibición. El error sobre el tipo es aquel que recae sobre los elementos constitutivos del delito. El *error de prohibición se refiere a una creencia equivocada de que se está actuando conforme con la Ley o a una causa de justificación que en realidad no existía.*" (Énfasis suplido.) *Pueblo v. Ruiz Ramos*, 125 D.P.R. 365, 393–394 (1990).

Londoño Berrío define el error de *prohibición* como la situación en que conociéndose que la conducta está en general prohibida, por *una* incorrecta *suposición fáctica* o por un equivocado enjuiciamiento jurídico, cree que su proceder esta justificado, que la norma cede por su prevalente derecho a actuar. H.L. Londoño Berrío, *El error en la moderna teoría del delito*, Bogotá, Ed. Temis, 1982, pág. 67.

Según Jiménez De Asúa, "[p]ara que el error se considere de hecho, ha de referirse a la representación de las características objetivas esenciales, sin atender a su significado jurídico; es decir, *estrictamente fácticas*, que han de hallarse en correspondencia con el núcleo o las exigencias terminantes al objeto o los sujetos expresados en el tipo legal. *Es, en suma, el error sobre la materialidad del hecho ejecutado*". (Énfasis suplido y en el original.) L. Jiménez De Asúa, *Tratado de Derecho Penal*, Buenos Aires, Ed. Lozada, 1962, pág. 329.

Higuera Guimera dice al respecto que:

> En los casos de error sobre los *presupuestos fácticos* de las causas de inculpabilidad, así por ejemplo, cuando el sujeto cree que existe el peligro que representa para él una amenaza pero que no se da en la realidad de la vida, nos encontramos ante

---

"No incurre en responsabilidad penal quien obre con la convicción errada e invencible de que no concurra en su acción u omisión alguna de las exigencias necesarias para que el hecho corresponda a su descripción legal." Leyes de Puerto Rico, *supra*.

una situación de inexigibilidad.

   ... [Esta] es semejante o equivalente, según muchos autores, *al error sobre las circunstancias que sirven de fundamento a una causa de justificación.* (Énfasis suplido.) J.F. Higuera Guimera, *Las Excusas Absolutorias*, Madrid, Ed. Marcial Pons, 1993, págs. 144-145.

     ■ Por otro lado, *invencibilidad* se refiere a la *imposibilidad de evitarse a pesar del empleo de las debidas diligencias por parte del actor.* Esto es de acuerdo al estándar del hombre prudente y razonable. Por lo tanto, si con la debida diligencia se hubiera podido evitar el resultado, el error era vencible y no exime de responsabilidad penal del delito cometido. Nevares-Muñiz, *op. cit.*, págs. 211-212.

Londoño Berrío, al exponer sobre la *vencibilidad*, expone que en los casos en que el autor tenga conciencia del carácter injusto de su acción y a pesar de ello realiza la acción, obrará con actual conocimiento y no será necesario analizar la evitabilidad de la representación, pues en ella no hay error. Para determinar la existencia de error, deben utilizarse las reglas sobre la imprudencia en la realización del hecho, principalmente en cuanto al deber de cuidado exigible.

   Por ello, el criterio para determinar el esfuerzo de conciencia exigible al autor para evitar el error de prohibición, tiene como guía principal las cualidades, las aptitudes, los conocimientos propios del autor. Esto permite que a una persona que cuenta con recursos superiores a la generalidad de los miembros de su misma categoría social, puede formulársele un juicio de reproche cuando él personalmente tenía capacidad de conocer la antijuridicidad de su acto; sería un juicio individual, un juicio personal de culpabilidad. En el juicio de imprudencia (evitabilidad del error), lo decisivo no es la previsión objetiva que realiza posteriormente el juez, *sino el juicio previo que el autor, en consideración a sus facultades, conocimientos, grupo social, grado de instrucción, memoria, condiciones anímicas en el momento del acto, se hubiera podido formar del carácter antijurídico de su obrar*; es decir, la capacidad del sujeto de observar el cuidado personalmente exigible para él, en consideración de dichas circunstancias. Londoño Berrío, *op. cit.*, págs. 70-71.

Cuando el error es *invencible*, excluye por completo la responsabilidad penal.(7) Sin embargo, no existe unanimidad sobre qué tipo de responsabilidad es imputable a un sujeto que haya incurrido en error vencible. *Para algunos tratadistas, si el error era vencible, se responde al título de imprudencia o negligencia. Para otros, se responde por el delito imputado, indistintamente de que se requiera intención o negligencia, pero con atenuantes.*(8)

En nuestro ordenamiento, ante el error vencible se responde a título de negligencia. Por ello nuestros pronunciamientos en *Pueblo v. Ruiz Ramos*, supra, págs. 368 y 395, que en casos de delitos de *negligencia* la defensa de error de hecho no está disponible.

Por un lado, el error de hecho es una defensa cuando se niega la existencia del estado mental que requiere el delito imputado. "[E]l acusado no puede ser convicto si demuestra no tener el estado mental exigido en la ley, para la comisión del delito." (Traducción nuestra y escolio omitido.) W.R. LaFave y A. Scott, *Substantive Criminal Law*, Minnesota, West Pub. Co., 1986, Vol. I, págs. 575–576.(9) "Si faltara la intención faltaría uno de los elementos integrantes y esenciales de todo delito, pues donde falta la intención, no puede haber delincuencia." *El Pueblo v. Dumas*, 14 D.P.R. 397, 402 (1908). Por otro lado, si la conducta constituye delito, independientemente de la existencia del *mens rea*, tal como la intención, el error de hecho no es defensa. 1 *Wharton's Criminal Law 15th*, págs. 77–78 (1993). Un ejemplo y, por excepción, son los delitos de responsabilidad absoluta. Tampoco cuando la negligencia es elemento del delito.(10)

---

(7) J.M. Luzón Cuesta, *Compendio de Derecho Penal: parte general*, 2da ed., Madrid, Ed. Dykinson, 1986.

(8) J.F. Higuera Guimera, *Las Excusas Absolutorias*, Madrid, Ed. Marcial Pons, 1993. El autor concluye que debe ser tratado como un error de prohibición, inspirado en la teoría de culpabilidad.

(9) Véase, además, 1 *Wharton's Criminal Law 15th* Secs. 1–99 (1993).

(10) El error de hecho puede, en circunstancias análogas a las del caso de marras, conllevar a incurrir en error sobre la persona. Sin embargo, ello no derrota la

Con este transfondo doctrinario en mente, analicemos si la defensa de error de hecho aplica al caso de autos.

## III

La prueba incontrovertida estableció que Carmona Rosado y Rivera Del Valle respondieron a un mensaje "10-50"[11] originado por compañeros policías que habían sido atacados con armas de fuego. Carmona Rosado y Rivera Del Valle reconocieron al vehículo descrito en el mensaje "10-50". Inmediatamente, les dispararon desde dicho vehículo. Dentro de estas circunstancias es razonable concluir que los policías Carmona Rosado y Rivera Del Valle estaban bajo la impresión de que ese vehículo era responsable de los disparos. Consecuentemente, era razonable perseguirlo con el fin de alcanzarlo y arrestar a sus ocupantes.

Durante la persecución, en la que participaron varias patrullas, el auto objeto de la persecución era un Chrysler, modelo New Yorker, de color gris. Este Chrysler rebasó a otro vehículo, marca Cadillac, de color crema, con características físicas similares. Las fotos en evidencia revelan el parecido de ambos vehículos. Se hizo aún más difícil distinguirlos debido a que era de noche (11:00–11:30 P.M.). La prueba de cargo estableció la forma *rápida y confusa* en

---

aplicación de la doctrina de error de hecho, si se cumplen todos sus requisitos.

El Art. 17 del Código Penal, 33 L.P.R.A. sec. 3081, dispone que ante un error en la persona, el autor incurre en igual responsabilidad que si hubiera cometido el acto en perjuicio de la persona contra quien dirigió su acción. "Este tipo de error, como se ha señalado por todos los tratadistas del derecho penal moderno, no excusa la comisión del delito, ya que no es un error que recaiga sobre alguno de [sus] elementos .... Así, si A quiere golpear a B, y por mala suerte C recibe el golpe y las lesiones, A no podrá alegar el error de hecho para eximirse de responsabilidad penal. Su intención era golpear a un ser humano, irrespectivamente del ser humano que fuere golpeado. En este sentido, el elemento mental sigue al acto o a la omisión." D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, San Juan, Ed. Inst. Desarrollo del Derecho, 1983, pág. 160.

[11] El sargento Morales Morales testificó que "una llamada 10-50 es una llamada que pide ayuda y las instrucciones que tienen los policías es acudir al área a dar ayuda, 'support', ya que peligra la vida de un policía, esto es casi siempre; el mensaje que trae es que peligra la vida de un policía". E.N.P., pág. 34.

que se desarrollaron los acontecimientos. Los tres (3) pasajeros del Cadillac testificaron que un vehículo New Yorker, color claro, les rebasó por el paseo a tal velocidad que temieron un impacto.

Ignorando tal hecho, Carmona Rosado y Rivera Del Valle creyeron que el Cadillac era el vehículo que estaban persiguiendo. De hecho, el mensaje "10-50" describió un Cadillac; no el vehículo agresor, un Chrysler, modelo New Yorker. Según esta creencia equivocada, actuaron conforme una causa justificada que en realidad no existía y continuaron la persecución tras el Cadillac. Ante este cuadro inicial tenemos que concluir que se trató de un error de hecho esencial. Ahora bien, ¿era invencible?

La prueba estableció que otros agentes dispararon contra el Cadillac antes y después de detenido. El informe preparado por el agente William Narváez y sometido en evidencia por el Ministerio Público, así lo demuestra. Aunque puede haber discrepancias en cuanto a la forma en que actuó la Policía —específicamente Carmona Rosado y Rivera Del Valle— si fueron o no razonables y prudentes, lo cierto es que lo hicieron bajo la errónea impresión de que el automóvil que perseguían había utilizado fuerza mortífera contra ellos.[12]

No cabe imputar intención de matar a Carmona Rosado y Rivera Del Valle por el hecho de que la mayoría de los disparos se produjeron luego de haber detenido el Cadillac. Ellos no fueron los únicos en disparar; al menos tres (3) policías más dispararon la noche de los hechos. Más aún, el arma con más proyectiles —Carabina 30— no pertenecía a los acusados.

Varios factores demuestran que era improbable saber que los ocupantes del Cadillac eran ciudadanos inocentes. Por lo tanto, no se podía vencer el error de hecho esencial cometido y evitar la balacera cuando se detuvo el Cadillac.

---

[12] La Orden Especial Núm. 92-2 de la Policía, si bien prohíbe expresamente disparar un arma de fuego desde o contra un auto en marcha, lo permite en circunstancias en que los ocupantes del otro vehículo usen fuerza física mortal en su contra.

*Primero*, el propio conductor del Cadillac, Hernández Vizcarrondo testificó que, al ver a su esposa herida, *aceleró* para conducirla a un hospital; este hecho fue razonablemente mal interpretado y dio a los policías la impresión de que los agresores intentaban huir. *Segundo*, el auto se detuvo, luego de que uno de los neumáticos se vaciara como consecuencia de los impactos de bala; esto le impidió a los policías reconocer que el conductor detuvo la marcha voluntariamente. *Tercero*, los ocupantes del vehículo se ocultaron en el piso del vehículo; esto obstaculizó a los oficiales del orden apreciar sus intenciones de rendirse.

Considerando el modelo de persona *prudente y razonable*, ante estas circunstancias era improbable que los policías conocieran que los ocupantes del "Cadillac" eran personas distintas a las que iniciaron los disparos y huyeron.

Aun cuando nos inclinamos a concluir una ausencia de negligencia, un escrutinio de la conducta de los policías a la luz de las cualidades, las aptitudes y los conocimientos propios de su cargo, puede apuntar a la existencia de cierto grado de negligencia. Luego de la confusión vehicular, sin que el supuesto vehículo agresor les disparara, continuaron disparando a través de toda la persecución, aún después de haberse detenido.

Como policías, estaban entrenados y adiestrados para lidiar con este tipo de circunstancias; capacitados para superar con prontitud el error cometido. Sin embargo, ¿procedía la condena por tentativa de asesinato?

Al concluir que el error era vencible, si se ejercía la debida diligencia, estamos ante una hipótesis delictiva de *negligencia*; esto dista del delito de tentativa de asesinato, cuya configuración requiere el elemento de intención criminal. *Pueblo v. Ruiz Ramos*, supra. Establecido que la tentativa sólo procede cuando el imputado haya obrado con el estado mental requerido para configurar el delito que se pretendió cometer[13] y que la actuación de los policías Car-

---

[13] *Wharton's*, supra, Vol. 4, Sec. 693 *et seq.*; Nevares-Muñiz, *op. cit.*, pág. 264; H. Silving, *Elementos Constitutivos del Delito*, Río Piedras, Ed. U.P.R., 1976, pág.

mona Rosado y Rivera Del Valle fue el resultado de un error de hecho —lo que denota falta de intención— no podemos penalizarlos criminalmente por el delito de tentativa de *asesinato*.

## IV

Considerando que existió algún grado de negligencia, debemos examinar si procede una condena por *tentativa de homicidio involuntario*.

■ Nuestra definición de negligencia, estatuida en el Art. 16 del Código Penal,(14) 33 L.P.R.A. sec. 3063, recoge las categorías delineadas por la tradición civilista. Así, "la negligencia puertorriqueña con sus modalidades de imprudencia[,] descuido, impericia, falta de atención o inobservancia de leyes y reglamentos equivale a la culpa civilista". (Citas omitidas.) *Pueblo v. Ruiz Ramos*, supra, pág. 388. Consecuentemente, se hace imperativo examinar las diferentes posiciones dentro del marco civilista en torno a la controversia que hoy abordamos.

Tanto quienes se oponen como quienes propulsan la existencia de la tentativa en los delitos negligentes han elaborado toda una gama de argumentos en favor de sus respectivas posiciones.(15)

Por un lado, la posición mayoritaria niega esa posibilidad. Se fundamentan en que la intención es contradictoria e irreconciliable con la negligencia. De acuerdo con esta posición, la tentativa de asesinato es imposible lógica,

---

107; W.R. LaFave, *Handbook on Criminal Law*, Minnesota, Ed. West Publishing Co., 1982, pág. 428; C.M. Bassioni, *Sustantive Criminal Law*, Illinois, Thomas Books, 1978, pág. 204.

(14) El Art. 16 del Código Penal dispone:

"Responde por negligencia la persona que ha producido un resultado delictuoso sin quererlo, por imprudencia o descuido o falta de circunspección o impericia o por inobservancia de la ley ." 33 L.P.R.A. sec. 3063.

(15) E. Farre Trepat, *La tentativa del delito: doctrina y jurisprudencia*, Barcelona, Ed. Bosch, 1986; L. Jiménez De Asúa, *Tratado de Derecho Penal*, Buenos Aires, Ed. Lozada, 1970, T. VII; Nevares-Muñiz, *op. cit.; Wharton's*, supra, Vol. 4; LaFave y Scott, *op. cit.*, pág. 208.

conceptual y lingüísticamente. Argumentan que " '[s]i el resultado no sobrevenido no fue conocido ni querido, falta entonces toda tentativa, no siendo posible que el hombre se esfuerce en aquello que no quiere que ocurra. El esfuerzo, la tentativa, son efecto de la voluntad, y faltando la causa, tiene que faltar igualmente el efecto' ". Jiménez De Asúa, *op. cit.*, 1990, T. VII, págs. 904–905.

Sin embargo, hay un sector doctrinal que admite la posibilidad. Éstos argumentan que " '[s]i [la tentativa] ... es la expresión imperfecta de una actividad que revela o adviene ofensiva, puede a su vez darse en los delitos culposos en los que hay un acto inicial voluntario y potencialmente capaz de producir una lesión jurídica, siempre que el resultado no subsiga y quede sólo en el acto, el cual debe de una parte acreditarse al agente y, por otra, conectarse por su peligrosidad al resultado dañoso que se ha evitado' ". (Escolio omitido.) Jiménez De Asúa, *op. cit.*, 1990, T. VII. De acuerdo con Jiménez De Asúa, " 'si se da, como no se puede poner en duda, un delito culposo consumado, también ha de darse un delito culposo no consumado (iniciado, intentado)' ". Íd., pág. 903.

Angiolini, citado por Jiménez De Asúa, expone que

[e]n los delitos [de intención], la figura de la tentativa queda integrada cuando el daño que fatalmente había de producirse, dada la intención del agente, no se consuma por circunstancias independientes de su voluntad. En los de [negligencia] tendremos tentativa cuando el daño que la imprudencia o la impericia habían de ocasionar necesariamente, no se produce por accidente extraño a la intención ... del agente. El mal no se ha consumado, pero, por efecto de la imprudencia podría deplorarse; el individuo se manifiesta, por tanto, bajo un cierto aspecto, como temible y por esto a su acción ha de responder la reacción social. Íd., págs. 910–911.

El derecho anglosajón coincide con la tradición civilista: mayoritariamente rechaza la posibilidad de la tentativa en delitos negligentes. La Fave, al cuestionarse si un acusado puede ser culpable de tentativa para cometer un delito definido sólo en términos de falta de circunspección (*reckless*) o negligencia, señala que al menos en teoría se concibe la

posibilidad. Por ejemplo, si el delito consiste simplemente en la creación negligente de un peligro y se demuestra que el acusado *intencionalmente* incurrió en la conducta productora del peligro. Sin embargo, aclara que este análisis no puede aplicarse cuando el delito consiste en falta de atención o negligencia causante de un resultado, pues de haber la intención de causar el resultado, la tentativa no sería de cometer delito negligente, sino el delito intencional causante del resultado. *Da como ejemplo, que toda vez la tentativa requiere el elemento de intención, no puede haber tal cosa como tentativa para cometer homicidio involuntario.* LaFave y Scott, *op. cit.*, pág. 430.

Por su parte, Torcia es más categórico al indicar que "[n]o puede haber tentativa de delito cuando la conducta es imprudente o negligente. Por definición, el actor debe que tener la intención de cometer el delito. La intención de cometer un acto no intencionado es, en sus términos, una contradicción". (Traducción nuestra.) *Wharton's*, supra, Vol. 4, Sec. 693, pág. 586.

Los tribunales estadounidenses se niegan a reconocer la tentativa en los delitos de negligencia, en particular la tentativa de homicidio involuntario (*involuntary manslaughter*). De hecho, no hemos encontrado ni un sólo tribunal que lo haya admitido.([16])

Un gran número de estos tribunales citan en sus decisiones a J.C. Smith, quien señaló en su afamado artículo *Two Problems in Criminal Attempts*, que:

---

([16]) *State v. Holbron*, 904 P.2d 912 (Hawaii 1995); *State v. Collins*, 893 P.2d 217 (Kan. 1995); *People v. Martinez*, 611 N.E.2d 277 (1993); *Stennet v. State*, 564 So. 2d 95 (1990); *State v. Barnes*, 781 P.2d 69 (Ariz. 1989); *People v. Hall*, 436 N.W.2d 446 (1989); *Cox v. State*, 534 A.2d 1333 (1988); *State v. Johnson*, 707 P.2d 1174 (N.M. 1985); *Vandeventer v. State*, 459 N.E.2d 1221 (1984); *State v. Huff*, 469 A.2d 1251 (1984); *State v. Almeda*, 455 A.2d 1326 (1983); *Taylor v. State*, 444 So. 2d 931 (1983); *Com. v. Griffin*, 456 A.2d 171 (1983); *Goodwin v. State*, 439 N.E.2d 595 (1982); *State v. Carson*, 640 P.2d 586 (Or. 1982): *People v. Hernandez*, 614 P.2d 900 (Colo. 1980); *Anthony v. State*, 409 N.E.2d 632 (1980); *State v. Howard*, 405 A.2d 206 (1979); *State v. Norman*, 580 P.2d 237 (Utah 1978); *Hull v. State*, 553 S.W.2d 90 (1977); *Com. v. Hebert*, 68 N.E.2d 1204 (1977); *Gonzalez v. State*, 532 S.W.2d 343 (1976); *People v. Genes*, 227 N.W.2d 241 (1975); *State v. Smith*, 534 P.2d 1180 (Or. 1975); *Commonwealth v. Gosselin*, 309 N.E.2d 884 (1974); *Commonwealth v. McCauley*, 246 N.E.2d 425 (1969); *People v. Foster*, 225 N.E.2d 200 (1967).

La imprudencia y la negligencia son incompatibles con el deseo o la intención. Así, un crimen que por definición se comete por imprudencia o negligencia y no intencionalmente, la imprudencia o negligencia se relacionarán con el resultado, no con las circunstancias, por lo que es imposible concebir la tentativa. Por lo tanto, no puede haber tentativa para cometer un homicidio involuntario. Cuando el resultado delictivo es la muerte de la víctima y es un acto hecho con la intención de lograr esto (una muerte), sí es tentativa de asesinato. En el homicidio involuntario es esencial que se produzca el resultado, ya por imprudencia o negligencia, pero no intencionalmente. (Traducción nuestra.) J.C. Smith, *Two Problems in Criminal Attempts*, 70 Harv. L. Rev. 422, 434 (1957).

Algunos tratadistas han discutido la situación particular en que se actúa inducido por *un error de hecho evitable*, sobre un presupuesto de una causa de justificación, la posibilidad de la tentativa de delitos negligentes se visualiza en su entorno. Sin embargo, se impone la opinión de que la creencia errónea de que concurren los supuestos de una causa de justificación excluye la intención, y si el error era evitable, existe negligencia. Por ello concluyen que

[r]especto de la tentativa de las figuras delictuosas que se penan a título de culpa [negligencia] no obstante el carácter voluntario del resultado ..., la tentativa tiene que excluirse en sustancia por las mismas razones por las cuales se excluye en los casos ordinarios de culpa, puesto que a pesar de la presencia de una relación finalista entre la voluntad y el resultado, ... la punibilidad está siempre sancionada a título de culpa, y por tanto subordinada a la producción del resultado. Si éste no se verifica los actos ejecutados permanecen indiferentes. Jiménez De Asúa, *op. cit.*, 1990, T. VII, pág. 916.

No obstante, parece haber consenso entre los tratadistas en que una cosa es que sea posible en teoría y otra que pueda enjuiciarse a una persona por delitos de negligencia en grado de tentativa. A la luz del ordenamiento jurídico penal vigente, lo determinante es ver si la legislación pertinente lo permite.

Jiménez De Asúa, al analizar los preceptos legales de España y Argentina, concluye que bajo ellos no es posible. Señala que "al decir, en el párrafo 3° del art. 30 del Código Penal de España, 'hay tentativa cuando el culpable da

principio a la ejecución del delito directamente por hechos exteriores', hace problemático el alegato de tentativa de [negligencia], puesto que la acción no está directamente encaminada a un delito."(17) (Énfasis suprimido.) Jiménez De Asúa, *op. cit.,* 1990, T. VII, pág. 918. Mientras tanto, el Art. 42 del Código Penal argentino señala: "el que con el fin de cometer un delito determinado." (Énfasis suprimido.) Íd. Jiménez De Asúa afirma que esta frase despeja toda duda en la negativa, "puesto que resulta obvio que el negligente o imprudente ... no realiza su hecho con el fin de cometer un determinado delito". (Énfasis suprimido.) Íd., pág. 918.

## V

■ Un análisis de nuestro estatuto penal nos lleva a concluir que bajo nuestro ordenamiento no son posibles los delitos de negligencia en grado de tentativa. La tentativa, según definida por el Art. 26 del Código Penal, *supra,* se da cuando se realizan acciones o incurre en omisiones *inequívocamente dirigidas* a la ejecución de un delito, el cual no se consuma por circunstancias ajenas a su voluntad.

■ Para configurar la tentativa, nuestro Código Penal establece como esencial, *actos u omisiones inequívocamente encaminados a la ejecución de un delito.* Este contrasta con el estado mental del negligente, que como bien señala Jiménez De Asúa, no realiza el acto o incurre en la omisión, con el fin de, ni equívocamente dirigido a la ejecución de un delito determinado.

---

(17) Cabe señalar que los tribunales españoles han rechazado la posibilidad de enjuiciar a una persona por delitos de negligencia en grado de tentativa, fundados básicamente en que los delitos negligentes requieren esencialmente, se genere un resultado consistente en una efectiva lesión del bien jurídico. Sentencias de 22 de noviembre de 1904; 5 de octubre de 1914; 15 de noviembre de 1919; 2 de octubre de 1976 (A. 4595); 12 de febrero de 1977 (A. 491); 6 de febrero de 1980 (A. 448); 7 de julio de 1980 (A. 3133); 30 de septiembre de 1980 (A. 3358); 18 de octubre de 1980, y 28 de mayo de 1982 (A.2732).

█ El principio de legalidad, exigente de estatutos claros y precisos que un hombre de inteligencia promedio comprenda la conducta que se pretende castigar, impide se juzgue a una persona por la tentativa de un delito que se configura con negligencia.[18]

*Se dictará sentencia revocatoria.*

La Juez Asociada Señora Naveira de Rodón concurrió con el resultado sin opinión escrita. Los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri disintieron sin opinión escrita.

---

[18] Obviamente aplica el principio constitucional de la presunción de inocencia. Significa, dentro del marco en el cual se debe examinar la prueba, que la presentada por el Ministerio Fiscal no fue susceptible de rebatir esa presunción más allá de duda razonable.